# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KIMBERLYN RAY and DONNA WILLIAMS,

    Plaintiffs,

  v.

EDNA A. WILLIAMS,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2017-0718-MTZ

## MEMORANDUM OPINION

Date Submitted:  December 12, 2019
Date Decided:  March 31, 2020

Neil R. Lapinski and Phillip A. Giordano, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware, *Attorneys for Plaintiffs and Counterclaim Defendants Kimberlyn Ray and Donna Williams.*

Jason C. Powell, THE POWELL FIRM, LLC, Wilmington, Delaware, *Attorney for Defendant and Counterclaim Plaintiff Edna A. Williams.*

**ZURN, Vice Chancellor.**

In this family dispute, I have the privilege of discerning the final wishes and intentions of Ronald R. Williams, who passed away on October 8, 2017.[1] In July 2017, Ronald knew he was dying and decided to spend his last weeks free from mistreatment by his caretaker and third wife, Edna A. Williams, who is the defendant and counterclaim plaintiff in this matter. With his children's assistance, Ronald left Edna and entered the care of his daughters by his second marriage: plaintiffs and counterclaim defendants, Kimberlyn Ray and Donna Williams.[2] While under his daughters' care, Ronald took measures to excise Edna from his finances and final days. He also changed his burial plans, deciding that he would like to be buried in the Delaware Veterans Memorial Cemetery, rather than in his marital plot at Gracelawn Cemetery with Edna.

Edna claims Ronald's decisions were the product of his daughters' undue influence. She seeks to unwind his decisions to make his daughters his beneficiaries and to be buried in the Delaware Veterans Memorial Cemetery. This post-trial decision finds that Ronald made those decisions independently, and leaves Ronald's finances and body as he wanted them.

---

[1] In this family dispute, I use the parties' first names in pursuit of clarity. I intend no familiarity or disrespect. Citations in the form of "[Name] Tr. —" refer to witness testimony from the trial transcripts. Citations in the form of "[Name] Dep. —" refer to deposition transcripts in the record. Citations in the form of "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Docket Item ("D.I.") 103. Citations in the form of "JX — at —" refer to a trial exhibit.

[2] *See* PTO ¶ 5.

## I.   BACKGROUND

After Ronald passed away on October 8, 2017,[3] Kimberlyn and Donna sought to effectuate their father's wishes.  Edna's disagreement led Kimberlyn and Donna to turn to this Court for assistance.  On October 10, Kimberlyn and Donna filed a Petition for Declaration of Deposit of Remains of Ronald R. Williams,[4] as well as a motion for a temporary restraining order prohibiting Edna from interfering with their disposal of Ronald's remains.[5]  They submitted a number of documents to the Court in an attempt to support Ronald's decision to be buried in the Delaware Veterans Memorial Cemetery (the "Veterans Cemetery") and to exclude Edna from his funeral arrangements.  After argument on October 11, Chancellor Bouchard granted Plaintiffs' temporary restraining order, and gave Kimberlyn and Donna authority to dispose of Ronald's remains (the "October 2017 TRO") pending a final merits determination.[6]

On November 13, Edna filed an Answer and Counterclaims.[7]  Edna brings nine counts against Kimberlyn and Donna.  Count I asserts a claim for undue influence or lack of testamentary capacity; Count II seeks invalidation of

---

[3] PTO ¶ 1.

[4] D.I. 1 [hereinafter "Pet."].

[5] D.I. 6.

[6] D.I. 21, 100.

[7] D.I. 23.

beneficiary designations and joint account title designations and damages; Count III seeks pre- and post-mortem books and records and demands an accounting; Count IV asserts a claim for tortious interference with prospective inheritance; Count V asserts a claim for tortious interference with economic interest; Count VI asserts a claim for unjust enrichment; Count VII seeks imposition of a resulting trust; Count VIII seeks a constructive trust; and Count IX seeks a declaration of Ronald's burial and last rights.[8]

Edna seeks an order declaring that she is authorized to make Ronald's last funeral and burial arrangements, including but not limited to the disinterment of his remains and reburial in their marital plot at Gracelawn Cemetery ("Gracelawn"); declaring that all documents and beneficiary designations procured and unduly influenced by Donna and Kimberlyn be rescinded or otherwise determined invalid; compelling an accounting by Kimberlyn and Donna of Ronald's assets for the period of July 30, 2017 through October 8, 2017; and assessing damages against Kimberlyn and Donna, including attorneys' fees and costs.[9]  Kimberlyn and Donna seek an order denying Edna's requested relief and determining that Ronald's body

---

[8] D.I. 23.

[9] D.I. 119 at 60–61.

should remain in the Veterans Cemetery and that changes to his beneficiary designations are valid, as well as costs and attorneys' fees.[10]

This case was reassigned to me on October 4, 2018[11] and proceeded through discovery. I held a four-day trial from June 3, 2019 through June 6.[12] At trial, nine witnesses testified live: Edna Williams, Kimberlyn Ray, Neil Kaye, M.D., Donna Williams, Patricia Williams, Lawrence Ray, Vincent Hazzard, Ronald R. Williams, Jr. ("Ronnie"), and Tiffine Williams. In addition, the parties submitted seventy exhibits. The parties completed post-trial briefing on October 31,[13] and I held post-trial argument on December 12.[14] These are my findings of fact based on the preponderance of the evidence presented at trial.

### A. The Williams Family

Ronald was born on January 15, 1947.[15] He was a hard-working and generous man with a moral compass.[16] He had a high school education and served in the military.[17] Ronald was married three times and fathered five children. He

---

[10] D.I. 123 at 58–59.

[11] D.I. 55.

[12] D.I. 112, 113, 114, 115.

[13] D.I. 119, 123, 125.

[14] D.I. 131, 132.

[15] JX 32 at StatePension000080.

[16] Edna Tr. 10:17–18.

[17] Edna Tr. 11:3.

first married Joyce Lewis and fathered one daughter with her, Cheryl Lewis, while serving in the military in Germany.[18] Joyce and Ronald divorced, and Ronald then married Patricia.[19] Together they had Donna, Kimberlyn, and Ronnie.[20] Ronald also had another son, Jonathan Williams.[21] In 1995, Ronald left Patricia and married Edna.[22]

### 1. Ronald's Children And Grandchildren

Ronald's daughter Kimberlyn has five children: only her daughter Ashly was involved in these events.[23] After divorcing her previous husband in 2006, Kimberlyn married Lawrence Ray in October 2015.[24] They lived in Philadelphia until 2018, when they moved to Newark, Delaware. [25] [26] Kimberlyn worked as a traffic flagger until 2016, when she went back to school.[27] She then worked as a

---

[18] PTO ¶ 3; Edna Tr. 8:15–18.

[19] Kimberlyn Tr. 252:24–253:3.

[20] PTO ¶ 3; Edna Tr. 9; Kimberlyn Tr. 499; Donna Tr. 627.

[21] The parties disagree as to who Jonathan's mother is. *Compare* D.I. 119 at 3, *with* D.I. 123 at 8.

[22] Edna Tr. 10:9–12; Patricia Tr. 733:9–22; Patricia Tr. 733:22–734:2.

[23] Kimberlyn Tr. 249:16–20.

[24] Kimberlyn Tr. 249:7–8, 249:13–15.

[25] Kimberlyn Tr. 263:22–24.

[26] Kimberlyn Tr. 247:23–24.

[27] Kimberlyn Tr. 250:8–18.

5

phlebotomist from October 2014 until July 2017.  At that time, Kimberlyn stopped working to help care for Ronald.[28]

Donna also lives in Newark.[29]  Donna has one minor daughter, N.W.[30] N.W.'s father is Vincent Hazzard, who is a military veteran.[31]  Vincent and Ronald were friendly and talked about their military service and life in general.[32]  Donna has allowed several family members to live with her over the years:  her "house was like a revolving door some days."[33]  Donna has always been closest with her sister Kimberlyn,[34] whose daughter Ashly frequently visited and stayed with Donna while Ronald was living in Donna's home.[35]  Ashly's friend and father of her child, Chris Ikomi, also visited Donna's house during that period.[36]  After Ronald's death, Patricia moved in with Donna.[37]

---

[28] Kimberlyn Tr. 250:19–251:1.

[29] Kimberlyn Tr. 401:24–402:10.

[30] Vincent Tr. 925:18–21.

[31] Vincent Tr. 925:18–21, 944:2–10, 946:9–947:2.

[32] Vincent Tr. 944:2–10, 946:9–947:2.

[33] Donna Tr. 714:19-21.

[34] Donna Tr. 627:23–24.

[35] *See* Donna Tr. 714:14–21.

[36] Kimberlyn Tr. 448:6–449:12; Donna Tr. 714:14–21.

[37] Donna Tr. 627:12–14; Patricia 755:1–757:19; *see also* Donna Tr. 630:5–14.

Ronnie is married to Tiffine Williams.[38] They live in New Castle, Delaware with their two children.[39] Ronnie and Tiffine regularly visited Ronald and Edna at their home from 2015 to 2017.[40] Ronnie had a relationship with his sisters Donna and Kimberlyn until Ronald left Edna in July 2017.[41] At that time, Ronnie and Tiffine stopped speaking to his sisters and father.[42] Ronnie refused to reach out to Ronald even after Patricia tried to convince him to do so in Ronald's final days.[43] Ronnie also developed a strained relationship with his mother Patricia, who was living with him until he asked her to move out.[44] In the tumultuous days around Ronald's death, Ronnie told Patricia that she could no longer live with him, and she feared that Ronnie might hit her.[45] Ronnie felt that Edna treated Ronald well and has supported Edna's position throughout this litigation.[46] He has memory problems due to a car accident.[47]

---

[38] Tiffine Tr. 1005:8–11.

[39] Tiffine Tr. 1005:5–15.

[40] Edna Tr. 59:1–3, 59:23–60:4.

[41] *See* Kimberlyn Tr. 456:2–8; Donna Tr. 601:9–602:3, 628:4–629:14, 816:17–19; Patricia Tr. 742:5–13.

[42] *See* Kimberlyn Tr. 456:2–8; Donna Tr. 601:9–602:3, 628:4–629:14, 816:17–19; Patricia Tr. 742:5–13.

[43] Donna Tr. 629:9–14, 630:4–14; Patricia Tr. 742:3–20.

[44] Donna Tr. 627:12–14; Patricia Tr. 755:1–757:19.

[45] Donna Tr. 627:12–14; Patricia Tr. 755:1–757:19; *see also* Donna Tr. 630:5–14.

[46] *See, e.g.*, Ronnie Tr. 1003:11–16.

[47] Ronnie Tr. 965:8–11.

## 2. Ronald And Edna

In the 1990s, Ronald worked as a certified nursing assistant at Delaware Psychiatric Center.[48]  In 1992, he met Edna, who was working at Delaware Psychiatric Center as a psychiatric nursing supervisor after earning her associate's degree in nursing.[49]  Ronald and Edna had an affair for some time before Ronald left Patricia and married Edna in September 1995.[50]  Edna and Ronald had no children together, but Ronald helped raise Edna's daughter from a previous marriage.[51]

Patricia and Ronald continued to have a romantic relationship for approximately six years after he married Edna, until around 2002.[52]  Thereafter, they maintained a friendly relationship and spoke at holidays and family gatherings.[53]  Patricia did not like Edna but "always tolerated her because she was in the family and [her] children . . . were involved."[54]

---

[48] Edna Tr. 9:15–20, 10:23–24.

[49] Edna Tr. 7:6–8:4.

[50] Edna Tr. 9:19–10:12; Patricia Tr. 733:22–734:2.

[51] Edna Tr. 8:12–24.

[52] *See* Patricia Tr. 734:3–735:9.

[53] Patricia Tr. 734:17–19, 735:7–12.

[54] Patricia Tr. 735:15–18.

Ronald loved Edna.[55]  They enjoyed watching television, going to flea markets, cooking, traveling, and frequenting Atlantic City.[56]  Edna described Ronald as "[t]he most wonderful man [she] ever met."[57]  Donna confirmed that there was "no doubt" Ronald loved Edna until the day that he died.[58]

Edna and Ronald jointly held several properties and accounts.  They jointly owned their marital home in Smyrna, Delaware, and a rental property located on 4th Street in Wilmington.[59]  Edna and Ronald held a joint account at PNC, and joint credit cards at Citibank, Visa, and Discover.[60]

In 2006, Ronald took out a $100,000 life insurance plan with MetLife (the "MetLife Policy").[61]  He initially named Edna as the primary beneficiary and his mother as the secondary or contingent beneficiary.[62]  Ronald also named Edna as the beneficiary of a $7,000 State of Delaware death burial benefit policy (the "Death Benefit").[63]  Edna was aware that she was the primary beneficiary on the

---

[55] *See, e.g.*, Donna Tr. 819:11–13, 911:19–22.

[56] Edna Tr. 11.

[57] Edna Tr. 10.

[58] Donna Tr. 911:19–912:1.

[59] Edna Tr. 12, 50.

[60] Edna Tr. 85:7–10, 91–92; *see also* JX 60.

[61] Edna Tr. 93–94; JX 64.

[62] Edna Tr. 93:21–24.

[63] Edna Tr. 86–87.

MetLife Policy and that Ronald held the Death Benefit.[64] Eventually, Ronald would name Kimberlyn and Donna as the beneficiaries of both the MetLife Policy and Death Benefit.[65] Ronald never discussed with Edna naming Kimberlyn or Donna as the beneficiaries of either asset.[66]

In 1997, Ronald and Edna purchased joint burial plots at Gracelawn Cemetery in New Castle, Delaware.[67] They paid for the plots over several years.[68] Ronald and Edna signed the plot purchase agreement and requested that they read "Together Forever."[69] Ronald's family knew he had purchased the Gracelawn plots and assumed that, at the time he purchased them, he was to be buried with Edna.[70] Ronald expressed that he wanted a non-religious ceremony,[71] and he wanted to be buried in a black pinstripe suit, wearing a hat.[72] When Ronald and Edna's relationship was healthy, Ronald told Edna that he did not want to be

---

[64] Edna Tr. 86:19–21, 94:1–5.

[65] Edna Tr. 87:2–5; *see also* JX 10; JX 12.

[66] Edna Tr. 87:24–88:2, 94:10–16. After Ronald had a falling out with Donna and Kimberlyn in 2012, he told Donna and others that he did not plan on leaving anything to his daughters. *Id.* 94:16–19.

[67] JX 45; Edna Tr. 96:9–16.

[68] Edna Tr. 96:17–18, 102, 432.

[69] JX 45.

[70] Kimberlyn Tr. 432:20–433:2, 433:6–13, 434:9–14.

[71] Edna Tr. 96:20–21, 97:1–5.

[72] Edna Tr. 97:6–10.

buried at the Veterans Cemetery and that he intended to be buried at Gracelawn.[73] But he made it clear that "[h]e wanted to be recognized for his service" with an honor guard, which Edna assumed was "a three-gun salute in honor of a veteran at their burial ceremony."[74]

Ronald and Edna remained married until Ronald died. Their relationship, like many in the Williams family, ebbed and flowed. This case centers on the state of their marriage in the months before Ronald passed away in 2017, when Ronald left Edna to live with and be cared for by his daughters Kimberlyn and Donna. The variable nature of relationships within the Williams family, and between Ronald and Edna, provides important context for that time.

### 3. The Williams Family Relationships

Relationships between members of the Williams family were periodically strained, and other family members took sides when a dispute erupted.[75] Ronald's relationship with Edna was at the heart of many family schisms.[76] Edna and her

---

[73] Edna Tr. 96:18–20, 123-26.

[74] Edna Tr. 97:10–12, 124:10–11. Edna later contended that Donna and Kimberlyn failed to provide an honor guard at Ronald's funeral. *See id.* 97:10–13. Edna is incorrect. Ronald had a "minimum requirement" honor guard because the riflemen were unavailable for his ceremony. *See* Donna Tr. 651:7–652:9.

[75] *See, e.g.*, Kimberlyn Tr. 254:21–255:21; Donna Tr. 627:23–628:15.

[76] *See, e.g.*, JX 22; JX 6 at Plaintiffs 000289–000300.

11

family have always been at odds with Ronald's daughters and their families.[77] Kimberlyn and Donna blamed Edna for their parents' failed marriage, and came to dislike Edna for the way she treated their father.[78]

From 1995 through 2006, Kimberlyn did not see Ronald or have a meaningful relationship with him because of his marriage with Edna.[79] While not fond of Edna, Kimberlyn still respected her because she was married to Ronald.[80]

Donna's relationship with her father after his marriage to Edna was similarly chilly, but she was in "sporadic" contact with her father.[81] Starting in 1997 and continuing into her young adulthood, Donna periodically lived with her father and Edna, and she remained in contact with him, including through her time at basic training.[82] When Donna broke her pelvic bone during basic training around 2001 or 2002, Ronald drove twelve hours to South Carolina to pick her up for leave.[83]

While at first Donna did not like Edna or understand why her father left her mother for Edna, she "eventually came to understand. This type of stuff happens.

---

[77] *See, e.g.*, JX 21; JX 22.

[78] *See, e.g.*, Donna Tr. 631:2–9.

[79] Edna Tr. 41–44.

[80] *See* Kimberlyn Tr. 413:2–4, 429:15–17.

[81] Donna Tr. 632:19–633:3.

[82] Donna Tr. 626:22–627:1, 633:4–12, 633:24–634:1.

[83] Donna Tr. 633:15–21.

My mother wasn't perfect."[84] Donna and Edna bonded.[85] Donna ultimately came to support Ronald's decision to marry Edna,[86] and Edna became an influential part of Donna's life.[87] Edna influenced Donna to pursue her advanced nursing degrees.[88] And Donna's relationship with Ronald and Edna progressed after Donna reached out to them following Edna's daughter's death in 2006.[89]

Ronnie also had a strained relationship with his father for some time prior to 2012.[90] Ronald became unhappy with his son after Ronnie was incarcerated after making a statement in court that displeased Ronald.[91] Edna and Ronald only saw Ronnie "occasionally."[92] But over time, Ronnie and his father "cultivated a very good relationship."[93]

---

[84] Donna Tr. 631:12–14; *see also id.* 632:8–13.

[85] Donna Tr. 631:15–17, 626:20, 627:1–2.

[86] Donna Tr. 631:18–20.

[87] Donna Tr. 626:16–18, 627:2–5.

[88] Donna Tr. 626:16–18, 627:2–5.

[89] Edna Tr. 44–45.

[90] Edna. Tr. 116:9–13.

[91] Edna Tr. 116:14–17.

[92] Edna Tr. 116:7.

[93] Edna Tr. 116:11–13.

### a. Ronald And Edna's 2012 Separation

Even though they experienced happy times, Ronald and Edna's relationship was "rocky."[94] Ronald left Edna for the first time in 2012.[95] At that time, Ronald and Edna were arguing frequently.[96] He decided to leave after a particular argument with Edna after a family barbecue.[97] Kimberlyn had invited Patricia, which angered Edna.[98] Edna angrily and "colorful[ly]" asked Ronald why Patricia was there.[99] Ronald became "bewildered," avoided her question, and left the room.[100] Donna and Kimberlyn did not like the way Edna had spoken to Ronald; both sisters confronted Edna, and Donna physically threatened her.[101] The argument led to "very ill feelings" between Donna and Edna.[102] That night, Donna

---

[94] Patricia Tr. 735:21–23; *see also* Edna Tr. 47:8–11 (discussing how Ronald left Edna considering their problems in 2012).

[95] Donna Tr. 600–01.

[96] Kimberlyn Tr. 503:10–13; Donna Tr. 600:3–9.

[97] *See* Edna Tr. 46:13–47: 11.

[98] Edna Tr. 46:13–15, 46:18; Kimberlyn Tr. 503:16–19, 504:12–24. Kimberlyn and Edna dispute whether Edna had prior knowledge of Patricia's attendance. *Compare* Edna Tr. 46:15–16, *with* Kimberlyn Tr. 504:15–20. That is irrelevant for purposes of this opinion.

[99] Edna Tr. 46:13–19.

[100] Edna Tr. 46:13–23.

[101] *See* Edna Tr. 46:22–47:3; Donna Tr. 505:3–5, 818:15–18.

[102] Edna Tr. 47:3–7, 110:22–11:1.

and Kimberlyn stayed at Edna and Ronald's home.[103]  Edna continued to disrespect

Ronald, and so her argument with Donna and Kimberlyn continued.[104]

Ronald decided to leave Edna and moved in with Donna and Kimberlyn at

his rental property in Wilmington.[105]  Edna arrived home to find that Ronald had

left.[106]  Ronald did not explain his reasons for leaving to Edna.[107]  He told his

daughters he left because "[h]e was tired of [Edna], tired of the way she would

treat him.  He was just tired of arguing . . . ."[108]  Edna concedes that "he left on his

own volition."[109]

Ronald was concerned that Edna would appropriate all of their jointly held

funds:  "[h]e wanted to make sure [] he had his part of the money."[110]  Ronald

shared this concern with his daughters and withdrew half of the funds in the joint

account, leaving the remaining half for Edna.[111]  Edna was concerned,[112] but

---

[103] Kimberlyn Tr. 505:6–10.

[104] Edna Tr. 47:8–10; Kimberlyn Tr. 505:11–506:4.

[105] Edna Tr. 47:8–11, 112:7–10; Kimberlyn Tr. 503–04, 506:10–12; Donna Tr. 600–01, 634:18–635:10; Ronnie Tr. 965–66.

[106] Edna Tr. 47:8–11, 111:1–4.

[107] Edna Tr. 110:8–12, 110:21–22, 111:3–4.

[108] Kimberlyn Tr. 506:19–507:3; *see also* Donna Tr. 600:3–9.

[109] Edna Tr. 112:13.

[110] Donna Tr. 600–01; *see also* Edna Tr. 113:18–114:3.

[111] Donna Tr. 600–01, 636:4–5; *see also* Edna Tr. 114:2–3.

[112] Edna Tr. 114:10–12.

Ronald "wanted to make sure he had access to money she couldn't get to."[113]

Upon Ronald's request, Donna opened a joint account with him at the Dover Federal Credit Union (the "DFCU Account").[114] Both Donna and Ronald were holders on the DFCU Account, "but the account was for him."[115] Donna had access to the account, but she did not use it.[116]

Ronald also made Kimberlyn an authorized user on his credit cards and placed her on his insurance.[117] On occasion, Kimberlyn and Donna asked their father for money to pay for miscellaneous things, which Ronald permitted.[118] Ronald made no other changes to his finances while living with his daughters in

---

[113] Donna Tr. 636:4–5.

[114] Donna Tr. 635:11–636:12.

[115] Donna Tr. 636:8–10.

[116] Donna Tr. 636:11–12.

[117] Edna Tr. 1018:11–13.

[118] *See* Edna Tr. 1018:9–15. Edna testified that "while he was staying there, they aggressively encouraged him to file for divorce, they aggressively encouraged him to change the beneficiary on his life insurance policies, made it well-known that they did not like me, that they did not want the marriage to continue." *Id.* 51:9–15. She later testified that Ronald "informed me that his daughter Kimberlyn had injected herself deeply into our finances. He had made her an authorized user on credit cards. She had asked to be put on our insurance, which she was. He said she was asking for money for various things such as car repairs and whatnot." *Id.* 1018:9–15. Kimberlyn's testimony conflicts with Edna's. *See* Kimberlyn Tr. 507:7–18. The preponderance of the evidence shows that Donna and Kimberlyn asked their father to pay for miscellaneous things and that he voluntarily allowed them access to his finances, not that they interjected themselves into Ronald's finances or stole his money.

2012.[119] His daughters never asked him to change his insurance beneficiary forms, complete a power of attorney, or execute a new will.[120]

While Ronald was living with his daughters, they encouraged Ronald to divorce Edna.[121] But Ronald had already been divorced twice and had "lost everything" each time.[122] Donna and Kimberlyn were also concerned about their father's age and health and suggested that he seek care.[123]

After roughly two months, Ronald decided to return home to Edna.[124] Ronald did not want to experience the financial loss that came with divorce again.[125] He also did not like losing his independence.[126] As he had done with Edna, Ronald "just left without saying anything."[127] His daughters returned home to discover that he was gone, without any explanation.[128] They eventually learned

---

[119] *See* Kimberlyn Tr. 507:7–18.

[120] Kimberlyn Tr. 507:7–18.

[121] Edna Tr. 51:9–11.

[122] Donna Tr. 638:7–639:11.

[123] Ronnie Tr. 966:22–23, 967:18–968:4. In 2012, Donna and Kimberlyn had reason to be concerned about Ronald's health. He was diagnosed with cancer in 2002 and began dialysis shortly after returning to Edna in 2013. *See* Edna Tr. 12–13.

[124] Edna Tr. 47:23–24, 50:18–22.

[125] Donna Tr. 638:7–639:11.

[126] *Cf.* Edna Tr. 99:10 (stating that "my husband tended to buck authority").

[127] Kimberlyn Tr. 508:2–9; *accord* Donna Tr. 638:7–11.

[128] Donna Tr. 638.

he had returned to Edna.[129]  Upon his return, Ronald colorfully communicated his displeasure with his daughters, as was typical for him.[130]

In the midst of these 2012 transitions, Edna filed a petition for a protection from abuse order against Donna and Kimberlyn (the "2012 PFA").[131]  Edna did so because Donna and Kimberlyn had threatened her.[132]  The 2012 PFA was granted against both Donna and Kimberlyn.[133]  Edna claims that Kimberlyn violated the 2012 PFA on one occasion when she called Ronald and Edna's home.[134]

After Ronald reunited with Edna, his relationship with his daughters chilled again.[135]  The 2012 PFA strained their relationship as well.[136]  While Donna did not see Ronald, she spoke to him occasionally:  their relationship was "very limited."[137]  Kimberlyn did not see or speak to her father from 2012 until roughly

---

[129] Donna Tr. 638.

[130] *See* Ronnie Tr. 966:1–6, 966:21–23, 967:18–968:4; Edna Tr. 1018:15–16. Ronnie explained that it was typical for Ronald to speak in vulgar, mean tones, but that those sentiments were unfounded at their core.  Ronnie Tr. 966:13–23. And Ronald lashed out when he felt his family was infringing on his independence.  *See id.* 970:19–24.

[131] Edna Tr. 48:24–49:6.

[132] Edna Tr. 49:1–3.

[133] Edna Tr. 49:3–6.

[134] Edna Tr. 49:7–50:3.

[135] *See* Kimberlyn Tr. 508:16–509:4.

[136] *See* Donna Tr. 640 ("There was a PFA against me.  We hadn't quite reconciled, but we weren't estranged.   So I talked to him on the phone, but I would never go to the house because I didn't want to have interactions with her, with Edna.").

[137] Donna Tr. 640, 817–19.

2015.[138] Edna, not Ronald, remained the primary reason for Donna and Kimberlyn's strained relationship with Ronald between 2012 and 2015.[139] After 2012, Ronald maintained a good relationship with Ronnie,[140] but was angry with his daughters.[141] Donna and Kimberlyn would not strengthen their relationship with Ronald until 2015, after his health began to fail.[142]

### b. The 2015 Reconciliation

When Ronnie learned that Ronald only had roughly five to six years to live, he suggested to Ronald and Edna that Ronald reconcile with Donna and Kimberlyn.[143] Ronald wanted his daughters back in his life, and after some convincing, Edna was also open to a reconciliation.[144] So were Donna and Kimberlyn.[145] Ronnie arranged a meeting sometime before August 2, 2015.[146] The family discussed the incident and agreed to resolve their differences, and Donna and Kimberlyn visited Ronald and Edna more often thereafter.[147] And

---

[138] Kimberlyn Tr. 508:16–509:4.

[139] Kimberlyn Tr. 258:9–260:9, 259:5–9; Donna Tr. 640:18–22.

[140] *See, e.g.*, Ronnie Tr. 971:1–3.

[141] *See* Ronnie Tr. 1002:24–1003:7.

[142] *See* Edna Tr. 55:22–56:12.

[143] Ronnie Tr. 1003:8–10, Edna Tr. 55:22–56:12.

[144] *See* Edna Tr. 56:6–12.

[145] *See* Donna Tr. 642:9, 643:6–8.

[146] *See* Donna Tr. 642:9–12.

[147] Edna Tr. 57:4–12; Donna Tr. 642.

eventually Ronald told his daughters the true reason he returned to Edna in 2012: "he loved his wife and he didn't want to die alone,"[148] and he "decided that he wouldn't want to lose [everything]" in a divorce.[149]

Donna began visiting her father as regularly as her job allowed.[150] Kimberlyn visited her father sporadically until May 2017; Kimberlyn's visits increased to at least once a week after that date.[151] From 2015 to May 2017, Ronnie visited Ronald almost every week to help Ronald and Edna with various choses and tasks around the house.[152] While Kimberlyn, Donna, and Edna tried to put the past behind them, their relationship remained strained.[153]

## B. Ronald And The Military

In addition to Ronald's complex relationships with his wife and family, this case prominently features Ronald's complex relationship with the military and how that relationship manifested in his burial decisions over the years. Ronald served in the United States Army for six years, remaining at the rank of private.[154] That "was a conscious decision on his part" because "[h]e did not want the

---

[148] Donna Tr. 819:11–19.

[149] Donna Tr. 638:21–639:11.

[150] Donna Tr. 642:23–643:2.

[151] Edna Tr. 57:18–22, 58:2–7.

[152] Edna Tr. 59:1–8.

[153] *See* JX 6 at Plaintiffs 000289–000300; Edna Tr. 57:7–8.

[154] Edna Tr. 97:19–20; Donna Tr. 647.

responsibility that went with higher rank."[155]   He was stationed in Vietnam from 1965 to 1967, where he witnessed difficult events and suffered two severe injuries.[156]

Ronald was shot in the elbow and caught a grenade between his legs.[157] After sewing his own leg up, Ronald was hospitalized for eighteen months.[158]   The Army wanted to amputate Ronald's injured arm, but he refused, even after being threatened with court martial.[159]   He left the military and received a Purple Heart.[160]   Thereafter, Ronald received disability checks from the Veterans Administration ("VA").[161]

When he returned home from Vietnam, Ronald was negative about his service.[162]   He was angry at the ineffective leadership that led to his injuries,[163] and

---

[155] Edna Tr. 97:21–23.

[156] *See* Edna Tr. 97:23–98:3, 99:12–24; Donna Tr. 647:21–648:4.  Ronald drove tanks. Soldiers slept under the tanks, and Ronald saw tank operators drive over them without checking if anyone was underneath, with fatal results.  Donna Tr. 647:21–648:4.  Ronald also suffered post-traumatic stress disorder from a combat situation in which he was forced to kill a booby-trapped child to save himself and his company.  Edna Tr. 99:13–18.  "He was very angry about that."  *Id.* Ronald "joined the Army because it was his desire to help children and he never imagined that he would be put in the position to actually have to kill one."  *Id.* 99:22–24.

[157] Edna Tr. 97:24–98:3; Donna Tr. 646–47.

[158] Edna Tr. 98:4–5; Donna Tr. 647:1–8.

[159] Edna Tr. 98:6–10, 98:18–20.

[160] Donna Tr. 646–48.

[161] Edna Tr. 98:18–22.

[162] Edna Tr. 99:3–5; Kimberlyn Tr. 432:3–15; Donna Tr. 648.

he suffered from post-traumatic stress disorder.[164] Ronald felt that the VA treated him and his fellow soldiers terribly when they returned home, and he was angry that there were no resources for veterans coming home from war.[165]

At the same time, Ronald was "was absolutely proud of his service to his country" and displayed his pride in many ways.[166] Ronald always wore a veteran's hat from at least the time he was married to Patricia until his death, and enjoyed wearing a hat that read "I'm a Dysfunctional Vietnam Vet."[167] He shared his war stories.[168] But perhaps most telling was his pride for Donna's military service.[169]

Donna became a licensed practical nurse after graduating from Delcastle's vocational program in 1997 and enlisted in the military in 2001.[170] Donna has been in the military since that time and has served numerous tours overseas.[171] Donna currently serves as a registered nurse for the VA Hospital in Perry Point,

---

[163] Edna Tr. 99:5–11.

[164] Edna Tr. 99:12–24; *see also* JX 58 at E.Williams000056.

[165] Edna Tr. 99:3–5; Kimberlyn Tr. 432:3–15; Donna Tr. 648.

[166] *See* Edna Tr. 123:15–18; 125; Donna Tr. 648:95–12; Patricia Tr. 740:14–741:3.

[167] Edna Tr. 124:18–22.

[168] Donna Tr. 647:3–4.

[169] *See, e.g.*, Donna Tr. 649:2–8 (stating she and Ronald had an "unbreakable" bond from their military service).

[170] Donna Tr. 624:9–14, 626:9–12.

[171] Donna Tr. 623–27.

Maryland.[172] She was recently promoted to the rank of master sergeant.[173] She received her associate's degree in nursing in 2016 and is now pursing her bachelor's degree.[174]

Watching Donna's military career flourish ignited Ronald's deeply held pride for his own service and transformed some of his negative thoughts about his return home from war.[175] When Donna was promoted to the rank of E7 after returning home from a tour in Iraq, Ronald attended the ceremony and pinned the new rank on her uniform: a special moment between two veterans.[176] Ronald was extremely proud of Donna's promotion:

> That is a big thing for us because that is the next step in leadership. My father never wanted to be where I am. He was so proud that I was able to do what I do, and carry it the way I do. He was proud of that because he didn't want that responsibility. And I was able to take that responsibility and run with it.[177]

Ronald planned a celebratory trip to Hawaii with Donna and Edna.[178] Donna and Ronald spent time at Pearl Harbor to honor the deaths of their fellow soldiers.[179] As Donna testified,

---

[172] Donna Tr. 623:19–626:1.

[173] Donna Tr. 623:24–624:2.

[174] Donna Tr. 623:10–18, 626:13–18

[175] *See* Donna Tr. 648–49.

[176] Donna Tr. 649:2–650:4.

[177] Donna Tr. 649–50; *see also* Edna Tr. 97:20–23.

[178] Donna Tr. 650:5–651:4; JX 46 at Plaintiffs 000302–03.

> [M]e and my father went. . . . It was a moment that we both shared. He was a veteran. I am a veteran. It was a once in a chance lifetime we are both able to go to Pearl Harbor. And we sat on the ship and we tried to both figure out. You know, replay Pearl Harbor as it happened in our heads. Just those different moments being able . . . strategically to sit down and think of stuff with my father in that moment was a proud moment for me and for him.[180]

Ronald was proud of Donna and his relationship with her; he shared an "unbreakable" bond with her.[181]

Through observing Donna's military career, Ronald's "grudge against the military in general"[182] became a more delineated disdain toward the VA Hospital, which he felt treated him poorly when he returned home from Vietnam.[183] Donna's honorable reception when she returned home, and Donna's own knowledge of the military, helped Ronald better understand his own position:

---

[179] Donna Tr. 650:5–651:4; JX 46 at Plaintiffs 000302–03.

[180] Donna Tr. 650–51; JX 46 at Plaintiffs 000302–03.

[181] Donna Tr. 649:4, 649:2–8. Donna stated that "[s]o many people on the outside looking in would never understand that." *Id.* 649:11–12.

[182] Edna Tr. 123:9–10.

[183] Kimberlyn Tr. 432:3–19.

He wasn't happy on how he was treated when he came home. Took me a long time to get him to understand the difference between the VA, veterans cemetery, benefits services. And I work for the VA hospital. So I had to get him to understand that. Things have changed, and that they are not the same people and policy . . . even when I came home from Iraq, he came to my ceremony. It was different. They acknowledged us. They treated us with respect and dignity that we deserved. He didn't get that. That what he was angry about.[184]

With this understanding, Ronald did not harbor negative feelings toward the veterans' benefits he received or veterans' cemeteries.[185] In fact, he always maintained that he would like his military service to be recognized in some way at his burial.[186] By the end of his life, Ronald was a proud veteran whose positive feelings about his service were invigorated by Donna's military achievements. Ronald consistently wanted to honor his service at his burial.[187]

## C. Ronald's Failing Health

In addition to the injuries he sustained in Vietnam, Ronald suffered from numerous health issues throughout his life.[188] When Edna met him, he had

---

[184] Donna Tr. 648:13–649:1. I find Donna's testimony credible, especially as to Ronald's feelings about the military later in life. I also find Kimberlyn's testimony consistent with Donna's and credible on this point.

[185] *See* Kimberlyn Tr. 432.

[186] Edna Tr. 97:10–12.

[187] *See* Edna Tr. 97:10–12; Kimberlyn Tr. 432; Donna Tr. 648–49.

[188] *See, e.g.*, JX 58 at E.Williams000052–57. Ronald's medical records identify roughly 45 "problems" in his health history.

hypertension, and shortly after marrying Edna, he had cervical spine fusions.[189] In 2002, he was diagnosed with renal cancer.[190] And in 2013, Ronald was diagnosed with an aortic aneurysm.[191] He also had cardiomyopathy, peripheral vascular disease, glaucoma, cataracts, and degenerative disk disease.[192]

In 2013, Ronald began dialysis for his renal cancer, beginning with home dialysis and then transitioning to a dialysis center; by 2017, Ronald needed inpatient dialysis three days a week.[193] The treatments required a catheter be placed in Ronald's chest.[194] Each treatment lasted hours, and each session fatigued and "drain[ed]" him.[195]

In March 2017, Ronald was diagnosed with lung cancer; by April, it had progressed to stage three.[196] Ronald's doctors explained that even with chemotherapy and radiation, there was only a twenty to twenty-five percent chance

---

[189] Edna Tr. 12–13.

[190] Edna Tr. 12:23–13:4; JX 58 at 653, 656.

[191] JX 58 at 649–650.

[192] Edna Tr. Tr. 14:4-12.

[193] Edna Tr. 12:23–13:4, 15:1, 16:7–11.

[194] Edna Tr. 15–16.

[195] Edna Tr. 15–16.

[196] Edna Tr. 15:2–4, 24:15–18; JX 58 at E.Williams000579, E.Williams000591; Masters Dep. 33. On April 6, 2017, Dr. Greg Masters, Ronald's oncologist, discovered that Ronald had two separate cancers: renal cell carcinoma and non-small cell lung cancer. Masters Dep. 25.

of a cure.[197]  But Ronald remained optimistic.[198]  Ronald pursued an "aggressive" approach to his treatment, and began daily radiation therapy.[199]  Ronald continued to receive dialysis.[200]

In addition to taking doctor-approved medications, Edna also gave Ronald a number of supplements that she ordered online.[201]  Ronald did not enjoy taking these supplements, found them difficult to digest, and complained about them to his family.[202]  His doctors did not approve these supplements:  according to Ronald's medical records, he was taking a number of medications and supplements that were not prescribed by his doctors and needed to be approved by his nephrologist.[203]  And Ronald informed his doctors that Edna had "thoughts about certain medications," such as opiates, and made Ronald stop taking them, despite being prescribed by his doctors.[204]

---

[197] Edna Tr. 15–16; Covell Dep. 58:1–3.

[198] Edna Tr. 15–16; Kimberlyn Tr. 455:13–17.

[199] JX 58 at E.Williams000581, E.Williams000591, E.Williams000893.

[200] Edna Tr. 16:7–11.

[201] *See, e.g.*, JX 6 at Plaintiffs 000294.

[202] *See, e.g.*, JX 6 at Plaintiffs 000294.

[203] *See* JX 58 at E.Williams000886; JX 6 at Plaintiffs 000294 ("Apparently, he has voiced concerns about his medications to one or all of you kids, be he does not tell the whole story.  Firstly, at least 80% of what he is taking is prescribed by doctors.  Aside from those, he is taking four supplements that have anti-metastatic properties.  Before I ever ordered these from Amazon, I discussed them with him.").

[204] JX 58 at E.Williams000463 (internal quotation marks omitted).

Ronald regularly experienced pain in his chest and shortness of breath.[205] He had difficultly eating and a restricted diet, and he experienced steady weight loss.[206] He became "quite frail and thin," requiring physical therapy for strengthening.[207] Ronald was a high "fall risk,"[208] and he eventually fell in his marital home and needed first a rolling walker, then a wheelchair.[209] Ronald needed assistance moving, travelling, going to the bathroom, and with daily living.[210] At least one person needed to accompany him to medical appointments and elsewhere.[211] And he came to require constant care and assistance in the home.[212]

Because he physically struggled to complete basic tasks, others assisted Ronald with filling out paperwork.[213] As early as March 2017, Edna assisted Ronald with completing paperwork.[214] Edna testified that she was "in the habit of

---

[205] *See, e.g.*, JX 58 at E.Willaims000460, E.Williams000462.

[206] *See, e.g.*, JX 58 at E.Williams000059, E.Williams000439, E.Williams000447, E.Willaims000460.

[207] JX 58 at E.Williams000462; *see also* JX 58 at E.Williams000449, E.Williams000454.

[208] JX 58 at E.Williams000439, Williams000453, E.Williams000982.

[209] *See, e.g.*, JX 58 at E.Williams000444, E.Williams000506.

[210] *See, e.g.*, JX 58 at E.Williams000445, E.Williams000449, E.Williams000981–82.

[211] *See* Kimberlyn Tr. 410–11, 414–15.

[212] *See* Donna Tr. 846–47.

[213] *See, e.g.*, JX 58 at E.Williams00594; Edna Tr. 26:12–27:2.

[214] JX 58 at E.Williams000594; Edna Tr. 26:12–27:2.

doing this for [her] husband, first of all, because he was experiencing tremors which made it difficult for him to write. And . . . he was losing manual dexterity."[215] When Ronald entered his daughters' care and as his health worsened throughout 2017, Ronald similarly allowed Donna and Kimberlyn to assist in completing paperwork.[216]

From the time Ronald began developing serious conditions until July 2017, Edna was his primary caregiver.[217] As Edna explained, even as early as 2002, and despite the fact that Ronald was "a very intelligent man," she attended his doctor's visits and helped explain what the doctors were treating him for and what procedures he was receiving.[218] While Edna recuperated from a disabling car accident in 2014, Ronald assisted her with her daily activities.[219] Edna, in turn, was there for Ronald during his significant health issues later in life.[220]

In the last two years of Ronald's life, Edna's care and effort on her husband's behalf increased exponentially.[221] As of March 2017, Edna was

---

[215] Edna Tr. 26:19–22.

[216] *See* Kimberlyn Tr. 428:5–6.

[217] Edna Tr. 17:16–17; *see also* JX 58.

[218] Edna Tr. 17:20–18:14.

[219] Edna Tr. 55.

[220] Edna Tr. 28.

[221] Edna Tr. 18–19.

devoting nearly all of her time to caring for Ronald.[222]  She assisted Ronald with nearly everything, including getting in and out of a car, dressing, shopping, cooking, cleaning, paying the bills, daily blood pressure and temperature readings, and communicating with Ronald's medical professionals.[223]  As Ronnie testified, it was "amazing" to watch Edna care for Ron.[224]   And Donna "admired" Edna for the very good care she provided Ron.[225]

While Edna provided admirable care for Ronald, at least after her accident, she kept the marital home in deplorable condition that made it very difficult for a sick man to live.[226]  According to his medical records, Ronald expressed concern that the condition of the home took a toll on his health:  "The patient states that he has lost significant weight.  He was living with his wife, who he has separated from, who was not supportive.  He notes that she is a 'hoarder' and the environment limited his appetite."[227]  Donna described the house as "atrocious:"[228] "It was just always animals, so dogs, cats. . . . Hair on the floor from the dogs.

---

[222] Edna Tr. 28.

[223] Edna Tr. 19, 28–29; Ronnie Tr. 972:8–20.

[224] Ronnie Tr. 972-73.

[225] Ronnie Tr. 972.

[226] *See* Kimberlyn Tr. 513–20; JX 19.

[227] JX 58 at E.Williams000460.

[228] Donna Tr. 662; JX 19.

Kitchen pretty much was food on the floor, food on the table, dishes in the sink."[229]

Edna was a vociferous online shopper, and papers and packages covered the floors.[230] The house was so cluttered that Ronald was unable to move about safely and without difficulty, and the conditions caused Ronald to fall on multiple occasions.[231] Eventually, Ronnie began renovating Ronald's bedroom in preparation for in-home dialysis, so Ronald began using the living room as a bedroom.[232] And although the renovations made the conditions worse, they were not the cause.[233] Rather, "[t]his is how she lived."[234]

Aside from sometimes eating at his bedside table, Ronald could hardly eat in the house.[235] Edna did not cook much, and Ronald had a limited appetite and preferred to order Chinese food.[236] But Edna still bought large quantities of groceries that went uneaten and expired.[237] These were left throughout the house,

---

[229] Donna Tr. 662; JX 19.

[230] Donna Tr. 663–64; JX 19.

[231] Donna Tr. 663:2–7, 664; JX 19.

[232] *See, e.g.*, Kimberlyn Tr. 519:1–5.

[233] Donna Tr. 663–64, 665–66.

[234] Donna Tr. 663:15–664:9.

[235] Donna Tr. 667.

[236] Donna Tr. 667:11–20, 668:8–11; Kimberlyn Tr. 518:5–8.

[237] Kimberlyn Tr. 517:21–518:8.

in the back of her car, and in multiple refrigerators and freezers filled to capacity.[238] Edna refused to throw away rotten and expired food.[239]

Donna and Kimberlyn knew that Ronald's "safety was an issue" at home.[240] They tried to help Edna clean the house and throw away expired food, but Edna refused and became angry, accusing them of stealing and throwing things away.[241] Edna was in denial.[242]

After watching Edna remove expired food from their trash can, Ronald became frustrated.[243] So he asked Donna to take photos of the house, saying "sarcastically" that "you never know, we may need them."[244] Donna did so, and those photos were submitted at trial.[245] They are consistent with Donna and Kimberlyn's testimony: the house was cluttered, the floors were covered in debris, packages were piled up, and the rooms were so crowded that it would have been

---

[238] Kimberlyn Tr. 516:17–517:18, 517:21–518:4.

[239] Donna Tr. 663, 664–65.

[240] Donna Tr. 665–66.

[241] Donna Tr. 663–64, 665–66.

[242] Donna Tr. 665–66.

[243] Donna Tr. 665–66.

[244] Donna Tr. 664–65.

[245] *See* JX 19; Donna Tr. 666:2–5 ("You know, so in my mind I laughed because I was just like, because I did exactly what he asked me to do. Granted, he was right. We needed them.").

difficult for anyone to navigate.[246]  And the freezer was crammed with food left in grocery bags.[247]

The responsibility of taking care of Ronald was "overwhelming."[248]  And Ronald was frustrated and irritable at the loss of his independence.[249]  Donna began to fear Edna was suffering from caregiver burnout.[250]  As Donna explained, caregiver burnout can happen easily for primary caretakers that have little relief: "she seemed to me she was wearing down.  And it showed.  Just in interactions, in conversations, things of that case. . . . She was annoyed a lot.  She didn't get much sleep.  If my father needed something, she was the one that had to do it."[251]

Edna's burnout manifested in her criticizing and chastising Ronald.[252]  She became verbally and physically abusive.[253]  Edna spoke to and treated Ronald in a "manner which was almost belittling."[254]  She criticized him for having accidents

---

[246] *See* JX 19 at Plaintiffs 000225–30, 000232.

[247] *See* JX 19 at Plaintiffs 000227.

[248] Donna Tr. 670.

[249] Edna Tr. 100:19–24; Ronnie Tr. 970:19–21.

[250] Donna Tr. 670:7–671:6.

[251] Donna Tr. 670–71.

[252] *See, e.g.*, Donna Tr. 652–53.

[253] *See, e.g.*, Donna Tr. 652–53; Patricia Tr. 736:8–13; *see also* JX 63 (noting "physical and emotional abuse").

[254] Donna Tr. 652–53.

that he could not control.[255]  And "if he had an accident in his clothes or something like that, she would make him stay that way until she felt like changing him.  Then she was really rough changing him.  He was scared of her."[256]  And Edna controlled other aspects of Ronald's life, including his finances.[257]  For example, Edna did not give Ronald cash and questioned him when he had it.[258]  In response, Ronald hid his change from the grocery store so that he could avoid a barrage of questions from Edna.[259]  Ronald informed Donna and Kimberlyn that Edna was treating him this way.[260]

By April 2017, Donna and Kimberlyn were accompanying Ronald and Edna to his medical appointments.[261]  Ronald also had a visiting nurse.[262]  But Donna felt that Edna needed further assistance to care for Ronald.[263]  In May 2017, Donna took leave under the Family Medical Leave Act ("FMLA") in order to help Edna care for Ronald.[264]  Ronald "did not like the fact that people had to take care of

---

[255] Donna Tr. 652–53.

[256] Patricia Tr. 736:8–13.  To be clear, Edna never hit Ronald.  *Id.*

[257] Kimberlyn Tr. 514:1–14.

[258] Kimberlyn Tr. 514:1–14.

[259] Kimberlyn Tr. 514:7–10.

[260] *See* Donna Tr. 736; Kimberlyn Tr, 514:1–4.

[261] *See* JX 58 at E.Williams000590.

[262] *See, e.g.*, JX  58 at E.Williams000536.

[263] *See* Donna Tr. 655:15–24, 656–57.

[264] Donna Tr. 655:15–24, 656–57, 661:11–23, 670–71; JX 58 at E.Williams000545.

him."[265]  At first it was difficult for him to accept his daughter Donna's assistance with his physical needs.[266]  But eventually, because of her nursing skills, Ronald allowed Donna to help him.[267]  Kimberlyn also started spending more time with Ronald.[268]

On July 24, 2017, Edna took Ronald to the emergency room because he was dehydrated.[269]  The next day, Edna informed Donna that Ronald "could not manage the step up into the house."[270]  When Edna pulled him up, they both fell.[271]  Edna told Donna that she was "not going to be able to get him to the doctor and to dialysis by [her]self anymore."[272]  Edna needed Donna's help, as did Ronald.[273]

### D.    Ronald Moves Out For The Last Time

In the summer of 2017, Ronald began complaining to his daughters about certain aspects of his healthcare.[274]  Ronald was unhappy with the number of

---

[265] Donna Tr. 654–55.

[266] Donna Tr. 654–55.

[267] Donna Tr. 654–55.

[268] Kimberlyn Tr. 264:1–18.

[269] Edna Tr. 150:1–6.

[270] JX 3 at Plaintiffs 000285.

[271] JX 3 at Plaintiffs 000285.

[272] JX 3 at Plaintiffs 000285.

[273] JX 3 at Plaintiffs 000285–86; Edna Tr. 151:11–152:2.

[274] *See* Donna Tr. 659.

medications he had to take.[275]  His primary gripe concerned the non-prescribed supplements that Edna ordered for him online and instructed him to take.[276]  They often made him feel ill and vomit.[277]  Ronald told Edna that "he had in issue with taking supplements," resulting in a "disagreement."[278]  He felt like Edna was not listening to him.[279]

Ronald also complained to his daughters about Edna's abuse and the condition of his home.[280]  He told them Edna "would chastise him" and "talk to him like he was a child."[281]  Ronald said this "[d]idn't make him feel like a man" and that "he didn't like to be talked to like that."[282]  Because Ronald was steadily losing his independence and because "[h]e was a prideful man," Edna's words were especially hurtful.[283]

In July 2017, even in the midst of their collective efforts to care for Ronald, tensions built between Edna and Ronald and consequently between Edna and his daughters.  Edna felt that Donna and Kimberlyn were "out to get [her]," and was

---

[275] Donna Tr. 659:6–8.

[276] Donna Tr. 659:8–12.

[277] Kimberlyn Tr. 513:19–24.

[278] Donna Tr. 600:22–661:3.

[279] Kimberlyn Tr. 513:14–15.

[280] Kimberlyn Tr. 514:3–24; Donna Tr. 653–54.

[281] Kimberlyn Tr. 514:3–4; *accord* Donna Tr. 653–54.

[282] Donna Tr. 653–64.

[283] Donna Tr. 654–55.

concerned about what others thought about the state of her marriage.[284] Edna also pointed out that Ronald would "act differently" when his children were present, standing up for himself.[285] Donna explained that all she wanted was for her father "to be at peace."[286]

Donna and Edna wanted to avoid a repeat of 2012.[287] They knew that Ronald did not have much time left.[288] On July 26, Ronald called a family meeting for Donna and Kimberlyn to air out their issues with Edna.[289] The conversation began calmly, but became more heated, and Edna, Kimberlyn, and Donna began to shout at one another.[290] Kimberlyn was angry and defended Ronald after Edna insulted Ronald:

> She made a comment to my father about how do you think it makes me feel when I have to clean your sh*tty *ss. Of course I stepped up and said, "That is what you're suppose[d] to do. You are his wife."[291]

---

[284] *See* JX 6 at Plaintiffs 000289; Edna Tr. 152:13–20; Donna Tr. 675:1–17.

[285] JX 6 at Plaintiffs 000295; Donna Tr. 676:13–677:3 ("[M]y dad was happy to see us when we were there. I also agree when we were there, my personal opinion is that my father knew that we had his best interest in mind. . . . I feel like, you know, he did act differently. I mean, here it says, 'I don't know if it's a macho thing' but I don't know, you know, maybe he felt better that we were there.").

[286] JX 6 at Plaintiffs 000289.

[287] JX 6; Edna Tr. 153:10–154:6.

[288] Donna Tr. 675.

[289] Donna Tr. 681.

[290] Edna Tr. 267:1–10; 265:11–21.

[291] Kimberlyn Tr. 521–22; *accord* Donna Tr. 676–77.

In the heat of the moment, Kimberlyn yelled that Ronald was dying, and he began to cry.[292] The meeting ended once everyone had calmed down; Donna and Kim offered to spend more time with their father to give Edna a break.[293] Donna and Kimberlyn left Edna and Ronald's home under the belief that they had resolved their problems.[294]

Edna was angry that Ronald did not defend her in front of his daughters and shared those feelings with him.[295] Ronald concluded "[i]t was clear that she had lied and never had any intentions of trying to move forward in working things out with [his] daughters."[296] He "sided" with his daughters.[297]

While Ronald had previously considered marital counseling, by this point Ronald was very frustrated with Edna and concluded that their relationship could not be saved. [298] He decided to leave Edna for the second and final time on July 30.[299]

---

[292] Edna Tr. 67:13–18.

[293] Donna Tr. 682:12–18; Kimberlyn Tr. 522:21–523:4.

[294] *See* Kimberlyn Tr. 265:14–21.

[295] Edna Tr. 196:20–197:1; JX 63 ("I was exhausted because all night I was unable to get any rest due to her blaming me that I did not defend her the night before and I took my daughter's side.").

[296] JX 63.

[297] JX 63.

[298] *See* Kimberlyn Tr. 523–24, Ronnie Tr. 1001:10–13, 1002:12–13.

[299] *See, e.g.*, Kimberlyn Tr. 523–24.

That day, Ronald asked Kimberlyn to come to his house.[300] Kimberlyn arrived with her Lawrence, Ashly, and her friend Chris.[301] Ronald told Kimberlyn that he wanted to leave and go to a nursing home: "I don't want to be here with her no more. I am sick of her stuff. I want to go. I want out of here."[302]

Kimberlyn called Donna and informed her that Ronald wanted Donna to come to his house because he wanted to go to a nursing home.[303] The news shocked Donna.[304] Donna arrived at the house.[305] Ronald said that "[h]e was tired of [Edna's] sh*t" and that "[h]e was getting tired of her chastising him, talking to him like a child."[306] Edna was not happy that Ronald wanted to leave, and tried to insert herself into his conversation with Donna and Kimberlyn.[307] She was having "little rages of fits" and making "sly, slick remarks to Ronald."[308]

Donna concluded that both Ronald and Edna were tired and needed a break from one another, so she suggested that Ronald stay with her for the night.[309]

---

[300] Kimberlyn Tr. 523–24.

[301] Kimberlyn Tr. 524:9–15.

[302] Kimberlyn Tr. 523–25.

[303] Kimberlyn Tr. 523–26; Donna Tr. 684.

[304] Donna Tr. 685:3–7.

[305] Donna Tr. 686.

[306] Donna Tr. 686.

[307] Kimberlyn Tr. 529.

[308] Kimberlyn Tr. 529.

[309] Donna Tr. 687–88.

Ronald agreed and reiterated that he just "want[ed] to leave."[310]  Edna "reluctantly agreed."[311]  They began gathering Ronald's belongings for the night, and tensions flared.[312]  When they asked if Edna could help get Ronald's clothing together, Edna remarked that "he was a grown *ss man" and that "[h]e can get his own clothes together."[313]  Right before they left, Edna told Ronald,"[I]f you die before you come back home, I will never forgive you."[314]

Everyone got in their respective cars, and Ashly was prepared to drive Ronald's vehicle.[315]  Several weeks earlier, Ronald and Edna had agreed that Ashly could use his vehicle while hers was being repaired.[316]  Edna stopped them and threatened that, if Ashly took the vehicle, she would cancel its insurance or report it stolen.[317]  In response, Kimberlyn physically threatened Edna as Lawrence held Kimberlyn back.[318]  Donna broke up the fight, and they left, leaving Ronald's

---

[310] Donna Tr. 687–88.

[311] Donna Tr. 687.

[312] Donna Tr. 688.

[313] Donna Tr. 688.

[314] Kimberlyn Tr. 529.

[315] Kimberlyn Tr. 532:7–9.

[316] Kimberlyn Tr. 531:14–532:4.

[317] Kimberlyn Tr. 532: 12–14, 532:23–533:7; Edna Tr. 168:15–18.

[318] Donna Tr. 689.

vehicle behind.[319]  Kimberlyn drove Ronald to Donna's house.[320]  Ronald said that he never wanted to go back to his marital home.[321]

After leaving, Ronald wanted to withdraw money from an ATM so that he could buy some Chinese food, so Kimberlyn took him to the ATM.[322]  Ronald's card was declined.[323]  Ronald concluded Edna had done something to prevent him from getting his money; in fact, in the days that followed, Ronald learned Edna had reported his card as stolen.[324]  Ronald grew concerned that Edna would take further measures to keep him from his assets.[325]  Ronald contacted the bank and informed the bank that Edna was not authorized to speak for him and "let them know what [his] intentions [were]."[326]

Ronald believed that Edna was a bad caregiver, and he was displeased with their relationship.[327]  After he left, Edna repeatedly called Ronald, questioning him

---

[319] Kimberlyn Tr. 533:19–22; Donna Tr. 689.

[320] Kimberlyn Tr. 536:12–21.

[321] Kimberlyn Tr. 536:12–21.

[322] Kimberlyn Tr. 534:3–20; Donna Tr. 690:13–24.

[323] Kimberlyn Tr. 534:24–535:5.

[324] Edna Tr. 114:13–115:1, 168:21–23, 171:17–20; Kimberlyn Tr. 535:12–17, 596:3–5; Donna Tr. 743:2–744:6.

[325] Kimberlyn Tr. 596:21–597:1.

[326] JX 63.

[327] Kimberlyn Tr. 540.

about when he would return home.[328]  Edna's sister sent Ronald harassing text messages.[329]  The "non-stop" calls and messages upset Ronald.[330]  He was angry about the incident with his vehicle:  "after the incident with the truck, he said he was done with Edna.  He did not want to come back."[331]  And he was also angry that Edna had reported his card stolen.[332]  Ronald decided to leave Edna for good.[333]  "He was mad.  He said he was tired of this and he . . . he didn't want to go through this again.  He said he didn't want to be with her anymore."[334]

On July 31, Ronald went back to his home to collect the remainder of his belongings, including his medications.[335]  Lawrence, Chris, and Kimberlyn went with him.[336]  Concerned about the altercation between Kimberlyn and Edna the

---

[328] Donna Tr. 691:23–693:7.

[329] JX 21 ("That's how I'll remember you. I don't know that I will ever see you again, because you have made a tragic mistake leaving your life in the hands of those girls, and because you are a moron about you [sic] meds you'll be dead sooner than you should have been.  So smoke up, have a blast and most importantly stop those annoying meds and doctor appointments.  Hope the girls enjoy your last days wiping your . . . ."); *see also* Kimberlyn Tr. 602:16–604:7; Donna Tr. 694:1–8.

[330] Donna Tr. 693–94, 695.

[331] Kimberlyn Tr. 536.

[332] Donna Tr. 693:20–23 ("I can tell you that he was upset one, because this is at this point they found out that his car[d] was reported stolen.  I do believe he was irritated about that.").

[333] *See* Kimberlyn Tr. 536–39.

[334] Kimberlyn Tr. 536–39.

[335] Donna Tr. 692; Kimberlyn Tr. 536–39.

[336] Kimberlyn Tr. 536:24–537:3.

previous day, Kimberlyn and Ronald agreed that Kimberlyn should arrange a police escort.[337]  An officer met them at the house.[338]

Ronald and Chris went inside to remove his belongings.[339]  Edna tried to speak to Ronald, but he did not want to interact with her, and the officer told her not to speak to him.[340]  Nonetheless, Edna pressed that Ronald was taken against his will.[341]  The police did not react to Edna's allegation and continued to identify items to be retrieved for Ronald.[342]  Ronald could not find his walker, glasses, and a number of medications.[343]  Edna claimed that she did not know where his walker was, and his glasses later materialized in Edna's vehicle.[344]  Edna hid these items, consistent with her destruction of Ronald's valuables in the past.[345]

The first few weeks caring for Ronald were very difficult for Donna, but she did what she had to for Ronald's well-being.[346]  Because Ronald had only planned on staying one day, Donna and Kimberlyn were not prepared for his extended

---

[337] Kimberlyn Tr. 537:6–18.

[338] Kimberlyn Tr. 537:19–24; 539:1–4.

[339] Kimberlyn Tr. 537:19–24; 539:1–4.

[340] *See* JX 63; Edna Tr. 80.

[341] Edna Tr. 162:5–163:3.

[342] Edna Tr. 162:5–163:3.

[343] *See* JX 63; *see also* Kimberlyn Tr. 536–39; Donna Tr. 694–95.

[344] *See* JX 63; *see also* Kimberlyn Tr. 536–39; Donna Tr. 694–95.

[345] *See* JX 63.  Edna denies his accusation.  *See* Edna Tr. 197:22–198:8.

[346] Donna Tr. 699–701.

stay.[347]  They spent the first week with him trying to organize all of his various appointments and needs.[348]  They devoted themselves to Ronald, and planned their lives around their new responsibility.[349]  Just as Edna had done when Ronald was living with her, Donna and Kimberlyn tended to Ronald's every need.[350]  They helped him around the house and either took him to his medical appointments or arranged paratransit. [351]

### E.  Edna's Continued Harassment After Ronald Left

After July 31, Ronald never returned to the marital house.  And but for one meeting, Edna never saw or spoke to Ronald again.  Ronald moved in with Donna.[352]  He made it clear to his daughters and others that he did not want to be with Edna and that he did not want her to be involved in the last months of his life.[353]  For example, Ronald's medical records demonstrate that he considered himself "separated" from Edna and that she was no longer his primary caregiver.[354]

---

[347] Donna Tr. 698:18–699:8.

[348] Donna Tr. 698:18–699:8.

[349] *See* JX 44; Donna Tr. 698:7–20.

[350] *Cf.* Ronnie Tr. 972:8–9.

[351] Donna Tr. 701.

[352] *See, e.g.*, Patricia Tr. 736–737.

[353] *See, e.g.*, Kimberlyn Tr. 536–39; Patricia Tr. 736:1–13.

[354] *See* JX 58 at E.Williams000438, E.Williams000945.

And he told Patricia that "he didn't want to be with [Edna]" because "she was very abusive to him."[355]

But Edna continued to be "a thorn in his side."[356] In addition to sending harassing messages, she reported his ATM card stolen so he was unable to withdraw funds from the joint account.[357] When Ronald moved in with Donna, he directed the Office of Pensions to send his documents to Donna's Newark address.[358] But on September 9, 2017, Edna completed an Office of Pensions change of address form to list Edna's Smyrna's address.[359] If accepted, this form would have diverted Ronald's mail from the Office of Pensions, potentially including his pension and Death Benefit checks and other benefit information, back to Edna.[360] The signature appearing on the document is not Ronald's.[361]

Edna testified that she did not sign and submit this form, even though she agreed that the signature at the bottom was not Ronald's and that Ronald was

---

[355] Patricia Tr. 736:1–13.

[356] Patricia Tr. 700:7.

[357] *See* Edna Tr. 114:13–115:1, 168:21–23, 171:17–20; Kimberlyn Tr. 535:12–17, 596:3–5; Donna Tr. 743:2–744:6; *see also* JX 63.

[358] Edna Tr. 120:9–11; Donna Tr. 707:2–14.

[359] JX 24.

[360] JX 24.

[361] Donna Tr. 707:2–7.

living with Donna at that time.[362]  Donna likewise did not recognize the signature as Ronald's and stated that the first time she saw this document was a few days before trial.[363]  I find that Edna completed and forged Ronald's signature on that document to divert his state benefits, and related information, back to her.[364]

And Edna turned to the police, Adult Protective Services ("APS"), and Family Court to continue to harass Ronald.  She filed another PFA against Donna and Kimberlyn based on the July 30 incident ("Edna's 2017 PFA") but did not appear at court to pursue it, and the Court denied the PFA.[365]  On August 3, Edna called the police, who reported to Donna's home to perform a welfare check.[366]  Ronald told the officer "that [he] was here on [his] own free will and did not want to return, that [he] was just fine."[367] The police left.[368]  And on August 16, Edna

---

[362] Edna Tr. 117:10–120:6; Ronnie Tr. 982:2–983:10.

[363] Donna Tr. 706:19–707:7.

[364] *See* JX 24.

[365] *See* JX 63; Edna Tr. 177:9–17; Kimberlyn Tr. 416, 417, 418, 541:24–542:7; Donna Tr. 726:7–727:7.  Donna and Kimberlyn were of the understanding that Edna was trying to obtain a PFA against Ron, as well as Kimberlyn and Donna.  Kimberlyn Tr. 416, 417. But, her PFA was only sought by Edna against Kimberlyn and Donna.  Edna Tr. 177:9– 11; Kimberlyn Tr. 418.  And when asked why she did not file a second PFA to protect her from Donna and Kimberlyn, Edna replied, "Quite honestly, my husband was dying and was away from me.  I had bigger fish to fry."  Edna Tr. 178:3–7.

[366] *See* JX 63; Donna Tr. 723:5–724:17.

[367] JX 63; *see also* Donna Tr. 723:5–724:17.

[368] Donna Tr. 723:6–724:17.

filed a complaint with APS, claiming Ronald was "coerced in leaving."[369]  Edna had APS contact Donna that day to inquire about Ronald's condition and Donna's home environment.[370]  The next day, Edna sent APS to check on Ronald at dialysis.[371]  Ronald "signed papers stating that he did not want their services.  He explained to them that he was where he wanted to be.  He didn't want to have anything to do with Edna.  He didn't want to talk to her.  He just wanted to be left alone."[372]  APS reported to Edna that Ronald was fine.[373]

On August 12, Edna confronted Ronald at his dialysis center.[374]  According to Ronald, "she showed up at my dialysis center bad mouthing me and trying to convince me that my daughters were trying to put me in a nursing home," and she was "getting me all upset."[375]  Edna was asked to leave.[376]  This was the last time Ronald spoke with or saw Edna.[377]

---

[369] Edna Tr. 207:20–24, 208:19–23, 209:5; Kimberlyn Tr. 550:3–7.

[370] JX 63.

[371] Edna Tr. 207:20–208:5.

[372] Kimberlyn Tr. 550:15–19.

[373] Edna Tr. 208:13–18.

[374] Edna Tr. 184:11–20; Donna Tr. 729:5–16.

[375] JX 63.

[376] Edna Tr. 184:18–20, 185:6–13; Donna Tr. 730:11–24.

[377] Edna Tr. 187:7–12, 187:20–22.

Ronald became adamant that he would not return to her.[378] He reported Edna's harassment to the police.[379] An officer came to Donna's home to speak to Ronald, but the officer told Ronald there was not much he could do.[380] If Ronald was "adamant about the harassment, he would have to file a PFA against her."[381]

Indeed, Ronald filed an emergency ex parte PFA against Edna on August 18, 2017 ("Ronald's PFA").[382] The court granted Ronald's PFA that day, to last until the hearing scheduled for August 31.[383] A Delaware Family Court employee recommended that Ronald prepare a written statement to attach to his petition.[384] Accordingly, Ronald dictated a statement that Donna typed for him.[385] She read the statement back to Ronald, and he agreed that it said exactly what he wanted it to say, and signed it.[386]

---

[378] Donna Tr. 697:4-7.

[379] Donna Tr. 728:1–3, 728:11–23.

[380] Donna Tr. 728:17–21.

[381] Donna Tr. 728:22–23.

[382] *See* JX 59; *see also* JX 18; JX 27; JX 63; Kimberlyn Tr. 540:12–14; Donna Tr. 739:8–18.

[383] JX 63; Donna Tr. 758:20–759:16.

[384] Donna Tr. 548:21–549:9.

[385] *See* JX 63; Donna Tr. 543:8–24. At the top of the statement in Ronald's handwriting appears "I Ronald R. Williams do authorize my daughter to type all the information." JX 63.

[386] Kimberlyn Tr. 543:1–19; 548:8–16; Donna Tr. 759:20–760:15; JX 63. The signature on the statement matches Ronald's signature and was notarized by the clerk of the Family Court. *See* Tr. 191:18–195:2.

In the statement, Ronald described Edna's harassment and verbal abuse and his desire to leave his wife and die in peace.[387] Ronald stated that "[s]he has been nonstop trying to get me to come home."[388] He recounted Edna's and her sister's harassing messages, Edna's frivolous PFA, Edna's efforts to call the police on Ronald's daughters, APS appearing to check on him at dialysis, and Edna's efforts to stop Ronald from accessing his money.[389] Ronald described his humiliation:

> I am 70 years old and this stress she is causing is detrimental to my health. Over the past year off and on I have dealt with all types personal and emotional abuse. She has talked to me like I was a child and chastised me for having accidents and belittled me for having accidents and not being able to do things that she felt maybe I should be able to do. She has constantly reminded me and my daughters that she has to clean me up all the time. Making me feel depressed and ashamed. I would like to charge her with elderly abuse because of my living conditions being unsafe, cluttered, kitchen unsanitary, cat and dog hair everywhere.[390]

He concluded, "I would very much prefer for her to stop trying to contact me, constantly harassing my daughters and accept things for the way they are and leave us alone."[391]

On August 31, Ronald, Kim and Donna appeared for Ronald's PFA hearing, but it was continued to September 15, because Edna had not been served.[392] Edna

---

[387] JX 63.

[388] JX 63.

[389] JX 63.

[390] JX 63.

[391] JX 63.

did not appear at the hearing on September 15.[393]  At that hearing, Kimberlyn and Donna sat in the gallery, watching Ronald speak with the Court for approximately ten minutes.[394]  The Court granted a one-year PFA in favor of Ronald and against Edna.[395]

The PFA did not deter Edna from contacting Ronald.  Around September 21, Edna sent Ronald a letter at the dialysis center.[396]  The letter recognizes that Ronald chose to leave Edna.[397]  The letter was not received until after Ronald's death.[398]

Edna also continued calling APS.[399]  In October, about two days before Ronald passed away, she caused APS to return to Donna's home to investigate his declining health.[400]  Donna did not speak with APS, but only led them to Ronald's

---

[392] JX 59; Donna Tr. 7621:24–762:19.

[393] Kimberlyn Tr. 547:17–548:7; Donna Tr. 763:2–766:3.

[394] Kimberlyn Tr. 547:17–548:7; Donna Tr. 763:2–766:3.

[395] JX 27.

[396] *See* JX 22; Edna Tr. 171:21–23, 172:6–10.

[397] *See* JX 22 at Plaintiffs 000051 ("You left under the pretense of going to Donna's for an overnight visit."), 000054 ("I feel as though for you to do this to me, you could never had loved me in any way, shape, or form."), 000058 ("And since you choose to leave me in the dark, how was I supposed to know you expected any thing different?"), 000059 ("I will have no good memories of you because they will all be tarnished by what you have done.").

[398] Donna Tr. 766:20–22, 767:8–13.

[399] *See* Edna Tr. 209:23–210:1; Kimberlyn Tr. 549:13–21; Donna Tr. 766:15–24.

[400] Edna Tr. 224:6–225:6; Kimberlyn Tr. 550:3–7; Donna Tr. 767:14–768:10.

bedroom: "When they went down there, they looked at my father, turned around and looked at me and said, I'm so sorry, and left."[401] APS told Edna that Ronald was receiving care.[402]

Ronald did not mention or consider divorcing Edna after he left her in July 2017.[403] Unlike 2012, he was not concerned about losing material things and was resolved that Edna, as his wife, would receive their houses, cars, and other property.[404] As discussed below, Ronald's primary financial concerns were his upcoming funeral expenses and making changes to ensure his daughters would not bear the burden of those costs. Otherwise, Ronald's chief concern was living the last days of his life free from the stress caused by his relationship with Edna: "I just want peace. I just want to die in peace."[405]

---

[401] Donna Tr. 768:4–15.

[402] Edna Tr. 224:24–225:1.

[403] Donna Tr. 639:14–24.

[404] Donna Tr. 639:14–24, 912:2–8. Ronald did prepare a will that would have left his estate to his daughters. *See* JX 26. He unsuccessfully attempted to execute that will once, but never attempted to again. I believe that Ronald was at peace with Edna receiving his estate as his wife and that he was primarily focused on making changes to his MetLife Policy and Death Benefit.

[405] Donna Tr. 639:14–24.

### F. Ronald's Mental Health

According to Edna, Ronald could not make decisions for himself after he left her on July 30.[406] Edna points to Ronald's depression and a purported bout of hallucinations due to prescribed opiate medications. While he sometimes "denie[d] a depressed mood,"[407] Ronald suffered from depression.[408] He also had anxiety from his physical complications, as well as his "complicated family dynamics and strained relationships."[409] His doctors noted that his feelings were "appropriate for the circumstances."[410] Ronald generally did not have difficulty speaking,[411] and had no difficulty communicating.[412] He was able to fully recount his medical history for doctors,[413] even though sometimes "he had a difficult time remembering all the information that he needed to provide."[414] Ronald was

---

[406] Edna Tr. 166:12–24.

[407] JX 58 at E.Williams000460; *see also* E.Williams000462.

[408] *See, e.g.*, JX 58 at E.Williams000438–39.

[409] JX 58 at E.Williams000447; *see also* JX 58 at E.Williams000444, E.Williams000467.

[410] JX 58 at E.Williams000467.

[411] *See, e.g.*, JX 58 at E.Williams000509 (noting he had "no difficulty with speech"), E.Williams00586 (noting Ronald could "verbalize" his concerns).

[412] *See* JX 58 at E.Williams000461.

[413] JX 58 at E.Williams000584–87.

[414] Edna Tr. 26:23–24.

prescribed a litany of medications, including antidepressants, one antipsychotic, and one antianxiety medication.[415]

Despite these complications, Ronald was otherwise in good mental condition.[416] His medical records from 2013 through 2017 repeatedly note that Ronald was "alert, oriented, cooperative, and appropriately conversant,"[417] that he had "normal attention span and concentration,"[418] and that his "mood and affect are appropriate for [the] circumstance."[419] Ronald was able to comprehend his treatment, understand communications with his doctors, and make decisions for himself.[420] The records explicitly state that Ronald was "oriented" and was not "forgetful" or "disoriented."[421] Edna admits that throughout 2016, Ronald was

---

[415] *See, e.g.*, JX 58 at E.Williams000590; Kaye Tr. 329:23–330:4.

[416] *See* Donna Tr. 658 (noting Ronald was "was able to speak for himself," "was alert," and "was oriented," and that "he ordered his own food, "had general conversation at the table" and that "[t]here was . . . nothing that showed that he was not of sound body and mind"); *see also* Kimberlyn Tr. 552–53, 605.

[417] *E.g.*, JX 58 at E.Williams000467, E.Williams000529, E.Williams000536, E.Williams000555, E.Williams000564.

[418] *E.g.*, JX 58 at E.Williams000462.

[419] *E.g.*, JX 58 at E.Williams000529.

[420] *See, e.g.*, JX 58 at E.Williams000444–46, E.Williams000551, E.Williams000584–87; Donna Tr. 702.

[421] JX 58 at E.Williams000542.

lucid.[422]  And Edna admits that none of Ronald's doctors indicated that he was incapable of making his own decisions before July 31, 2017.[423]

In fact, Ronald made all of his own medical decisions.  Donna "did not need [] to hold his hands on every encounter:"[424]  "He engaged in the conversation.  He understood.  He acknowledged that he understood.  If he didn't understand something particular, he would ask a question.  If the doctor would clarify or I would try to help him understand exactly what it is they were saying."[425]  He sometimes had difficulty understanding finances and other affairs, and his daughters assisted him.[426]  And as discussed, as a result of his physical limits, they helped him fill out paperwork.  But the decisions were Ronald's.[427]

Between July 20 and October 8, 2017, Kimberlyn saw her father at least six days per week.[428]  In that time, he was never forgetful, confused about what he wanted, confused about what he owned, or confused about what he wanted after he

---

[422] Edna Tr. 135:3.

[423] Edna Tr. 137:9–16.

[424] Donna Tr. 702.

[425] Donna Tr. 703.

[426] Donna Tr. 703.

[427] Donna Tr. 921:11–14 ("My father.  We read everything.  He gave us his decisions based off of his knowledge, not ours -- or his thoughts.  I mean, we just filled it out for him.").

[428] Kimberlyn Tr. 552–53, 605.

passed; he did not suffer from delusions or hallucinations.[429]  And he even saw a psychologist "[j]ust so he could express how he felt what he wanted.  So he wouldn't be taken that he wasn't in his right state of mind.  So that he was talking to a professional who he knew was advocating for him if his state of mind ever became in question."[430]

After Ron's lung cancer diagnosis, he was prescribed oxycodone and OxyContin for pain relief.[431]  Edna and her expert, Dr. Neil Kaye, made much of the fact that these drugs could have interfered with Ronald's cognition.[432]  But Ronald's medical records demonstrate that his opiate medications cognitively impaired him on only one occasion, in May 2017.[433]  On May 1, Edna contacted Ronald's doctor to report that OxyContin caused Ronald to have "delirium."[434]  The doctors recommended that Ronald permanently stop OxyContin and continue taking only oxycodone.[435]  On May 9, Ronald visited the doctor again,

---

[429] Kimberlyn Tr. 552–53, 605.

[430] Kimberlyn Tr. 552:23–553:4.

[431] *See, e.g.*, Edna Tr. 32; JX 58 at Williams000570.

[432] *See* JX 48.

[433] *See* JX 58 at E.Williams000570.

[434] JX 58 at E.Williams000570.  Medical records from May 2, 2017 state that Ronald's "wife noticed mental status changes after starting OxyContin with visual and auditory hallucinations after starting oxycodone.  She called yesterday and was instructed to stop the oxycodone.  His mental status has improved."  JX 58 at E.Williams000563.

[435] JX 58 at E.Williams000565.

accompanied by his daughters.[436]  Records from that visit state that after stopping OxyContin, Ronald's hallucinations had "resolved."[437]  Ronald was "alert, oriented, cooperative, and appropriately conversant."[438]

Ronald did not experience any "mental status changes" or "hallucinations" after May 2017.  In fact, on August 21 and September 21, his doctors noted that they assessed his "opioid risk" and that "[t]he patient score was 0 with low risk category."[439]  Ronald told his doctors that "he [was] not sure why he was take[n] off of [OxyContin]," and speculated that it was because "his (ex?) wife had 'thoughts' about certain medications and may have had him stop taking this."[440]  For his part, Ronald "state[d] that he thinks he did have a good response to the Oxycontin."[441]  That day, Ronald was "[a]lert and cooperative," had "normal mood and affect," and had "normal attention span and concentration."[442]  As a result, Ronald's doctors felt that it was safe to prescribe OxyContin at a lower dosage.[443]

---

[436] JX 58 at E.Williams000554, E.Williams000556.

[437] JX 58 at E.Williams000554.

[438] JX 58 at E.Williams000555.

[439] JX 58 at E.Williams000445, E.Williams000461.

[440] JX 58 at E.Williams000463.

[441] JX 58 at E.Williams000463.

[442] JX 58 at E.Williams000462.

[443] JX 58 at E.Williams000463.

Ronald and Edna were aware that they could and should contact his doctors again if the hallucinations resumed, but they did not.[444] Neither Ronald nor his daughter reported that his medications were impairing his cognitive abilities, and his medical records after August 21 demonstrate that Ronald was "alert" and "answers questions appropriately,"[445] was having an "appropriate[]" emotional response to his circumstances,"[446] was able to understand and comprehend the doctor's directions,[447] was able to communicate his thoughts and concerns,[448] and was making decisions for himself.[449]

Dr. Kaye submitted an expert report and testified at trial on the potential effects that Ronald's medications, physical condition, and life circumstances could have on his mental state.[450] Dr. Kaye opined that Ronald was a "highly susceptible individual" and reliant upon others for all of his needs.[451] Much of Dr. Kaye's opinion is premised on the fact that Ronald needed assistance completing daily

---

[444] *See* JX 58 at E.Williams000565.

[445] JX 58 at E.Williams000447.

[446] JX 58 at E.Williams000447.

[447] *See* JX 58 at E.Williams000447, E.Williams000445.

[448] *See, e.g.*, JX 58 at E.Williams000445–46.

[449] *See, e.g.*, JX 58 at E.Williams000445–46.

[450] *See* JX 48. Dr. Kaye is a board-certified psychiatrist, specializing in the brain, behavior, and emotion. Kaye Tr. 299.

[451] JX 48.

activities and attending medical appointments.[452]  Dr. Kaye also posited, as Edna

had told Ronald's doctors, that his opiate medications caused hallucinations and

made Ronald psychotic.[453]

Dr. Kaye's opinion and testimony are not credible or supported.  Ronald's

medical records demonstrate that Ronald was in good mental health, considering

his physical conditions.  He was alert, able to understand his conditions and

treatments, and able to make decisions.  While he was heavily reliant on others for

his physical needs, his cognition was his own.  His doctors did not express concern

that his mental state was declining, and they did not express that his depression or

anxiety were so crippling that Ronald could not think for himself.  Dr. Kaye opined

that Ronald's medications *could* impair his judgment and cause hallucinations.[454]

Ronald's doctors agreed that his medications and conditions *could* affect his

mental status.[455]  But the record does not support a finding that Ronald actually

---

[452] JX 48.

[453] Kaye Tr. 311.

[454] JX 48.

[455] Dr. Covell noted that oxycodone or any narcotic *could* affect Ronald's mental status. Covell Dep. at 50, 52.  He also noted that Ronald's conditions *could* cause altered thinking, including metastatic lung cancer, particularly if it had metastasized to the brain; end stage renal disease that required hemodialysis; cardiac issues; COPD; hypoxia, if his oxygen was low; chronic anemia; and sleep apnea.  He never saw Ronald display these symptoms. *Id.* at 72.  And Dr. Masters said that use of opiates or narcotics *could* have potentially serious side effects such as delirium or delusions. Masters Dep. at 64.  Dr. Masters also stressed that chemotherapy and radiation *could* make people less aware mentally. *Id.* at 76.

suffered any cognitive impairment from his medications from July 2017 onward.[456] The speculation by Edna and Dr. Kaye does not offer a substantial basis to believe that Ronald's mental state was materially different or impaired between the time he executed the power of attorney in Edna's favor on July 24 and the end of September 2017.[457]

Edna's testimony as to Ronald's decision-making capabilities is not credible, and is inconsistent with her own actions. Edna and Ronald discussed his final wishes during June and July 2017.[458] Edna prepared a power of attorney, and on July 24, Ronald read and signed it.[459] That document appointed Edna as his primary agent and Ronnie as the contingent agent.[460] According to Edna, Ronald was interested, engaged, and competent to sign that power of attorney.[461] She was not with Ronald when he signed the document, and she did not produce the document in this case.[462] But Edna does not question the validity of the power of

---

[456] *See generally* JX 58 (noting time and again that Ronald was alert, aware, and able to make decisions for himself).

[457] *See Sloan v. Segal* (*Sloan II*), 2010 WL 2169496, at *5 (Del. 2010) (TABLE).

[458] Edna Tr. 140:8–15.

[459] Edna Tr. 142:7–22.

[460] Edna Tr. 143:12–144:8.

[461] Edna Tr. 182:4–15.

[462] Edna Tr. 143:12–144:8.

attorney executed in her favor.[463]  Thus, as recently as July 24, Edna believed that Ronald had the capacity and mental faculties to execute binding legal documents.[464]

And after Ronald executed the power of attorney in Edna's favor, Edna and Ronald decided to meet with Edna's attorney, Jason Powell, Esquire, to draft estate planning documents.[465]  Edna planned for Ronald to meet with Mr. Powell to sign the remaining estate planning documents on August 2, with the understanding that he would have the capacity to make his own decisions.[466]  Because Ronald left Edna, this meeting never happened.[467]

Edna has offered no evidence that Ronald became incapable of making his own decisions after July 24.  And her testimony is inconsistent with contemporaneous documents and testimony showing Ronald continued to make his own decisions, including medical decisions and the decision to leave Edna.[468] Edna also lacks personal knowledge of Ronald's decision-making capabilities after July 30, as she did not have any meaningful contact with him after that time.  I

---

[463] Edna Tr. 182:4–15.

[464] *See* Edna Tr. 137:9–16.

[465] Edna Tr. 141:7–142:9.

[466] Edna Tr. 140:8–12, 142:14–19, 146:5–14.

[467] Edna Tr. 142:14–19, 146:5–14.

[468] *See, e.g.*, JX 22; JX 58.

conclude Ronald retained his full mental faculties and could make his own decisions until the first week of October 2017, shortly before his death.

But Ronald's physical health continued to decline.[469] Contrary to Edna's allegations, Kimberlyn and Donna were not to blame for Ronald's worsening condition, and they did their best to care for him in the last months of his life.[470] While Ronald's physical health declined steadily, his mental health did not decline until the days before he died in October 2017.[471]

## G. Ronald's Decision To Remove Edna From His Finances And As A Beneficiary

Once Ronald left Edna, he also took measures to protect his finances. As in 2012, Ronald was concerned that Edna would drain their joint bank account.[472] He was concerned about his checks, his VA checks, his Social Security check, and his pension.[473] Accordingly, he took steps to ensure she would not infringe on his

---

[469] *See generally* JX 58.

[470] *See generally* JX 58 (demonstrating that Ronald's daughters were his primary caregivers after July 30, 2017).

[471] Donna Tr. 703.

[472] Donna Tr. 601. Ronald even voiced his concerns to Patricia, saying that "every time he leaves [Edna] she ends up taking money out of the account, puts it into her account." Patricia Tr. 743.

[473] *See* Kimberlyn 596–97 ("He was concerned about his checks, his VA checks, his SSI check. And his pension, that he wouldn't be able to have access to that money."), Donna Tr. 637–38 ("At this point he had stated he had checks that were getting ready to come in. He needed to make sure he had access to his money. He did not want to have what happened happen in 2012 where money was taken out of the account or, you know, issues with the bank account."), 696.

funds, including "changing the accounts, having her taken off as authorized user[, and] [m]aking sure that his checks went into an account he had access to."[474] Donna and Kimberlyn helped get Ronald's finances in order.[475]

Ronald knew that certain checks were due to be deposited into his account, so he acted quickly.[476] With Donna's assistance, on August 1, Ronald reopened the DFCU Account that he had opened with Donna in 2012, and directed his checks to be deposited there.[477] Like Edna, Donna and Kimberlyn needed access to Ronald's bank accounts and credit cards to help him pay for things that he wanted to buy because of his physical limitations.[478] Ronald gave his daughters access to his bank accounts so they could go to the ATM for him.[479] And with Ronald's approval, Donna and Kimberlyn used his credit cards.[480] They never used his credit card or bank account without his permission.[481] In addition to using those accounts to pay for Ronald's needs, Ronald also permitted his daughters to

---

[474] Donna Tr. 601.

[475] *See, e.g.*, Donna Tr. 637–38, 696.

[476] Donna Tr. 638–39.

[477] Donna Tr. 636:6–638:6, 697:2–24, 704; *see also* JX 8; JX 9.

[478] Kimberlyn Tr. 598:13–22.

[479] Donna Tr. 703–04.

[480] *See* Kimberlyn Tr. 599:3–20; *see also* JX 53.

[481] Kimberlyn Tr. 599:21–23.

pay some of their own expenses as compensation for his care.[482]  In the same vein, Kimberlyn's husband, Lawrence, occasionally asked Ronald for money, and Ronald gave it to him.[483]

Donna and Kimberlyn called financial institutions for Ronald, at Ronald's instruction and in his presence, in order to arrange to have Edna taken off his accounts.[484]  Ronald spoke for himself and authorized his daughters to speak to on his behalf.[485]  Edna had similarly communicated on Ronald's behalf in the past.[486] Donald and Kimberlyn also helped Ronald use a computer to find phone numbers and other information.[487]

Edna makes much of the fact that Ronald allowed his daughters to access his finances, and claims they took his money.  But she admitted that upon moving in with Donna and Kimberlyn, he would have continued to consume the same things

---

[482] Kimberlyn Tr. 599:3–20.

[483] Lawrence Tr. 872:9–14, 883:5–11.

[484] *See* Donna Tr. 703–04 ("He wanted to talk to the bank, he could talk to the bank.  Did we call the bank for him?  We would make phone calls to them.  At times I would make phone calls to his brother, hand him the phone.  There were some things that we had to do for him, but it didn't mean that he didn't understand what was going on.").

[485] Donna Tr. 703–04; *see also* JX 43.

[486] *Cf.* Edna Tr. 169:2–4, 241:7–8; JX 58 (demonstrating that Edna would contact doctors and complete forms on Ronald's behalf).

[487] Donna Tr. 703–04 ("He couldn't look up phone numbers, or he didn't have access to look up phone numbers because I don't have a phone book in my house.  So a lot of phone numbers that we had to look up were on the internet.  We did those things for him, finances wise.").

that he did while living with her.[488]  She could not quantify the money Donna and Kimberlyn allegedly took, and she had no idea how Ronald spent his money while living with Donna and Kimberlyn.[489]  I do not find Edna's testimony that Donna and Kimberlyn stole from Ronald or coerced him into giving them access to his finances to be credible.

Ronald also removed Edna as the beneficiary on his accounts, replacing her with Donna and Kimberlyn.  On August 2, 2017, Kimberlyn took Ronald to the state pension office so that he could route his pension checks to the DFCU Account, rather than their joint account.[490]  Ronald also executed a change of beneficiary form to remove Edna as the beneficiary of his Death Benefit, instead naming Donna and Kimberlyn.[491]  Ronald made this change on his own volition.[492]  And although Ronald executed the change of beneficiary form in Donna and Kimberlyn's favor, the $7,000 Death Benefit was always intended to pay for Ronald's funeral expenses and was used for that purpose.[493]  Donna and Kimberlyn still owe the funeral home approximately $5,000.[494]

---

[488] Edna Tr. 232:21–233:11.

[489] Edna Tr. 230:20–23, 233:14–19.

[490] Kimberlyn Tr. 558:19–559:17, 560:4–22; JX 11.

[491] Kimberlyn Tr. 558:19–559:17, 560:23–562:19; JX 10.

[492] Kimberlyn Tr. 558:19–559:17, 560:23–562:19; Donna Tr. 705:16–21; JX 10.

[493] Kimberlyn Tr. 557:7–558:8, 558:19–559:17, 560:23–562:19, 595–99; JX 32.

[494] Kimberlyn Tr. 562:20–563:1; JX 47.

Ronald also decided to name Donna and Kimberlyn as the beneficiaries of the MetLife Policy.[495]  At Ronald's direction, Kimberlyn called MetLife in early August.[496]  Kimberlyn and Ronald called on speakerphone so that Ronald could hear and speak if necessary.[497]  Initially, a MetLife employee spoke to Ronald and asked for permission for Kimberlyn to speak; he gave it.[498]  Kimberlyn informed MetLife that Ronald wished to change the beneficiaries under his policy.[499]  MetLife informed them that they would mail Ronald an application form.[500]  Ronald received the form and filled it out with Kimberlyn.[501]  They attempted to mail it back, but MetLife never received the application.[502]

In September, Ronald knew that he was going to die and began to get his affairs in order, including how he and his daughters would pay for his funeral.[503] He did not want Donna and Kimberlyn to be burdened with the expenses, and was

---

[495] Kimberlyn Tr. 563:12–17 ("[B]ecause he changed the beneficiaries to the pension, burial pension, he wanted to change the beneficiaries to the MetLife policy."); *see also id.* 264:15–265:10; Patricia Tr. 741:9–23.

[496] Kimberlyn Tr. 565:11–24.

[497] Kimberlyn Tr. 565:11–24.

[498] Kimberlyn Tr. 566:1–3.

[499] Kimberlyn Tr. 565:11–24.

[500] Kimberlyn Tr. 566:3–6.

[501] Kimberlyn Tr. 566:7–22.

[502] Kimberlyn Tr. 566:7–22.

[503] Kimberlyn Tr. 565:8–13, 567:1–7, 569:8–24 ("He wanted to go ahead and take care of his funeral arrangements, then get his coffin, all that stuff together before he died.  He didn't want me and my sister to be bothered with that burden.").

adamant that these funds go to Donna and Kimberlyn to help them pay for his funeral, rather than to Edna.[504] They had not yet received a funeral estimate, but had an appointment scheduled.[505] So on September 12, he asked Kimberlyn to call MetLife to request, on his behalf, that $20,000 of his policy be cashed out so that Donna and Kimberlyn could cover his funeral expenses.[506] As was their standard practice, the call was on speakerphone, Ronald was present for the entirety of the call,[507] and the MetLife representative asked for Ronald's permission to allow them to discuss his policy with Kimberlyn.[508] He gave it.[509] Kimberlyn then assisted Ronald with completing the necessary paperwork.[510] MetLife approved the advancement request, but Ronald and his daughters never received the check.[511]

Kimberlyn and Ronald received a new application and a new change of beneficiary form from MetLife.[512] Kimberlyn helped Ronald complete the forms,

---

[504] *See* Kimberlyn Tr. 567:3–7.

[505] Kimberlyn Tr. 453-455.

[506] Kimberlyn Tr. 453–455, 565:8–13, 567:1–7, 569:8–24; *see also* JX 12.

[507] Kimberlyn Tr. 565:16–20, 567:8–568:2; *see also* Lawrence Tr. 877:3–9 ("He would use the phone . . . They're just assisting"); JX 43.

[508] Kimberlyn Tr. 566:2–6, 567:8–568:2.

[509] Kimberlyn Tr. 565:3–13, 567:8–568:2; JX 43.

[510] JX 65.

[511] Donna Tr. 775:7–14.

[512] Kimberlyn Tr. 568:3–569:3.

and he signed them on September 13.[513]  They sent them back to MetLife.[514]  On September 13, Donna and Kimberlyn became the beneficiaries of the MetLife Policy.[515]  Ronald wanted to remove Edna as the beneficiary of the MetLife Policy, and all of his daughters' actions were done at Ronald's request.[516]  The MetLife Policy has not been paid out to Donna and Kimberlyn, and the entire $100,000 remains in MetLife's possession.[517]

### H.    Ronald's Decision To Excise Edna From His Burial Plans

By August, Ronald's health was worsening and by mid-September 2017, his doctors informed him that there was nothing else they could do; Ronald was going to die.[518]  Ronald took the news about as well as anyone possibly could and decided it was time to get his affairs in order.[519]  Donna and Kimberlyn purchased a CD with forms for wills, powers of attorney, and last wishes documents.[520]  Donna and Kimberlyn assisted Ronald with executing a number of these documents to fulfill his intention of removing Edna from his personal and medical

---

[513] JX 66.

[514] Kimberlyn Tr. 568:3–569:3, 445.

[515] Kimberlyn Tr. 439; JX 25; JX 66.

[516] Kimberlyn Tr. 570:1–18; Lawrence Tr. 886:11–887:14; Donna Tr. 777:2–778:21.

[517] D.I. 132 at 62:20–63:9.

[518] Donna Tr. 769:21–772:17; *see also* JX 44 at 259.

[519] Kimberlyn Tr. 441:5–13; Donna Tr. 772:18–773:5.

[520] Donna Tr. 773:7–12.

affairs in his last days. They "always had a conversation with [Ronald] about every document that he had to sign, or that involved him."[521]

On September 22, at the Dover Federal Credit Union, Ronald executed the durable power of attorney form in favor of Kimberlyn and Donna.[522] A Dover Federal Credit Union employee witnessed and notarized the power of attorney, and swore that she asked whether Ronald knew what he was signing and that "while elderly and in a wheelchair, [Ronald] seemed fine."[523] When Ronald signed the power of attorney, he had his full mental capacity.[524] He executed this document because "he wanted to take Edna out of the equation of making medical decisions for him."[525]

Ronald also completed a will form with Donna and Kimberlyn's assistance.[526] Ronald asked Donna and Kimberlyn to fill out the will and instructed them on what to write.[527] Under this will, Donna and Kimberlyn would have received Ronald's estate, but they never asked for that nor pursued that;

---

[521] Donna Tr. 617.

[522] JX 28.

[523] JX 42 ¶¶ 6, 8.

[524] *See* Donna Tr. 787:21–22.

[525] Kimberlyn Tr. 555:15–24.

[526] JX 26.

[527] Kimberlyn Tr. 577:2–578:2.

rather, they were comfortable with Edna receiving Ronald's estate.[528]  Ronald tried

to execute the will at the Dover Federal Credit Union, but was instructed that he

would need an attorney to do so.[529]  Ronald died without executing the will.[530]

Within the first days of living with Donna, Kimberlyn asked Ronald whether

he still wanted to be buried with Edna.[531]  He said no, and that he did not want to

be anywhere near her.[532]  He told Donna the same and was adamant that he did not

want to be buried at Gracelawn with Edna.[533]

Three documents submitted at trial reflect Ronald's wishes for his funeral

and burial:  the application to be buried at the Veterans Cemetery,[534] a handwritten

"Statement of Wishes,"[535] and two versions of a "Five Wishes Document."[536]

Because he was a veteran, Ronald was entitled to be buried at the Veterans

Cemetery; after leaving Edna, he decided he wanted to be buried there, and

---

[528] Kimberlyn Tr. 578:3–580:12; Donna Tr. 780:21–785:16; JX 26.

[529] Kimberlyn Tr. 436–38.

[530] Kimberlyn Tr. 436–38.

[531] Kimberlyn Tr. 587:9–12.

[532] Kimberlyn Tr. 587:9–12 ("He said he didn't want her to be buried over top of him. He didn't want her to be nowhere near him.").

[533] Kimberlyn Tr. 587:14–16.

[534] JX 14.

[535] JX 23.

[536] JX 13; JX 57.

discussed his desires with Lawrence and Vincent, among others.[537] Donna and Kimberlyn assisted him with researching and completing the burial application.[538] On the day Ronald applied for burial at the Veterans Cemetery, Patricia asked him why he no longer wanted to be buried at Gracelawn.[539] Ronald responded that he "did not want that fat B laying on top of him" and that he wanted to be buried at the Veterans Cemetery.[540] He did not want Edna at his funeral and "didn't want her to be involved or see anything."[541] Donna and Kimberlyn were aware that, even if Ronald chose to be buried in the Veterans Cemetery to escape Edna, Edna could choose to be buried at the Veterans Cemetery upon her passing.[542] On August 10, 2017, Ronald received notice that his application to be buried at the Veterans Cemetery had been accepted.[543]

---

[537] Kimberlyn Tr. 587:19–23, 588:1–5; *see also* Lawrence Tr. 872:2–8; Vincent Tr. 938:12–15, 954:7–10, 955:8–14.

[538] Kimberlyn Tr. 588.

[539] Patricia Tr. 737:19–738:2, 738:3–13 ("He said, I went over to the VA to submit -- put an application in for my plot at the veteran's cemetery. I said oh, I thought you had a plot. I thought you was going to are buried in Grace Lawn. He said that he did not want that fat B laying on top of him. Q. Those were his exact words? A. No. He did not want the fat b*tch laying on top of him. Q. So what was your understanding of where he wanted to be buried? A. He wanted to be buried at the VA cemetery.").

[540] Patricia Tr. 737:19–738:2, 738:3–13.

[541] Donna Tr. 738:10–23.

[542] Donna Tr. 622.

[543] JX 14.

Ronald also prepared a handwritten Statement of Wishes document on September 18.[544]  Before completing this document, Donna and Kimberlyn discussed it with him and ensured that he knew what he was signing.[545]  While Kimberlyn's handwriting appears on the Statement of Wishes, Ronald wrote the statement himself.[546]  The Statement of Wishes evidences that Ronald did not want Edna to have control of his body:

> Funeral arrangements to be handled by my daughters Kimberlyn Ray and Donna Williams[.]  Under no circumstances do [] I want my body to be claimed or handled by my wife Edna A. Williams[.]  I do not want my wife Edna A. Williams to have any dealings with funeral arrangements or to attend my funeral services or burial.[547]

While the Statement of Wishes does not mention the Veterans Cemetery, it is consistent with testimony supporting the finding that Ronald did not want Edna involved in his burial and that he wished for Donna and Kimberlyn to have the responsibility of handling his burial and remains.[548]

Finally, Christiana Care provided Ronald with a document titled "Five Wishes" (the "Five Wishes Document"), which Ronald completed and signed.[549]

---

[544] JX 23.

[545] Kimberlyn Tr. 573–575.

[546] JX 23; Kimberlyn Tr. 575–77.

[547] JX 23.

[548] Kimberlyn Tr. 493:2–7; Donna Tr. 768:16–769:8, 774:2–10.  The Statement of Wishes is also consistent with the information appearing in JX 13.

[549] Kimberlyn Tr. 616:8–13.

Two copies of the Five Wishes Document have been provided: Joint Exhibit 13 ("JX 13") and Joint Exhibit 57 ("JX 57"). JX 13 was produced by Donna and Kimberlyn, and JX 57 was produced by Ronald's doctor together with Ronald's medical records.[550]

Ronald signed both JX 13 and JX 57, and both were signed by Vincent and Chris as purported witnesses.[551] Vincent testified that he did not watch Ronald sign the document, and Ronald's signature was already on the document when it was presented to him.[552] JX 13 and JX 57 bear different dates: JX 13 is dated August 3, and JX 57 is dated August 13.[553] Donna testified that Ronald signed both documents on August 3 at Donna's house.[554] Vincent also testified that he signed both documents that day.[555]

JX 13 contained the same contents as JX 57 when both were signed.[556] Both name Donna as primary health care agent, and Kimberlyn and Ashly as secondary agents; provide that Ronald did not want to be an organ donor; and evidence

---

[550] JX 13; JX 57.

[551] JX 13; JX 57.

[552] Vincent Tr. 940.

[553] *Compare* JX 13, *with* JX 57.

[554] Donna Tr. 714:1–715:13; Vincent Tr. 930:5–931:9, 933:15–934:4.

[555] Vincent Tr. 936:2–937:14.

[556] Kimberlyn Tr. 490–491.

72

Ronald's choices as to life support treatment and comfort care in different contexts.[557]

But JX 13 and JX 57 bear one major substantive difference: page 9 of JX 57 is blank, while pages 6 and 9 of JX 13 contain additional terms in Donna's handwriting.[558] Page 9 of JX 13 states:

> Funeral arrangements to be handled by my daughters, Kimberlyn Ray and Donna Williams. Under no circumstances do I want my body to be claimed by my wife Edna Williams nor do I want my body to be claimed by my wife Edna Williams nor do I want Edna Williams to attend my funeral services or to make any decisions on my behalf. She is to have no dealings with my arrangements.[559]

It also notes that Ronald wanted to be buried in the Veterans Cemetery.[560] JX 57 does not include this language.[561] As of August 3, when both versions were signed, both versions' burial wishes section was blank because Ronald had yet to be accepted to the Veterans Cemetery.[562] Donna added this information to JX 13

---

[557] JX 13; JX 57.

[558] *Compare* JX 13 at Plaintiffs 000189, Plaintiffs 000192, *with* JX 57 at E.Williams000475, E.Williams000478.

[559] JX 13 at Plaintiffs 0000192.

[560] JX 13 at Plaintiffs 0000192.

[561] *Compare* JX 13, *with* JX 57.

[562] Donna Tr. 711:9–19, 712:5–713:18

after Ronald received approval to be buried in the Veterans Cemetery, but testimony varied as to when that was.[563]

I find that Ronald signed both JX 13 and JX 57 on August 3. The August 13 date on JX 57 is inaccurate, and Vincent and Chris did not actually witness Ronald signing it. And although the information appearing in JX 13 is consistent with Ronald's wishes,[564] I find Donna added the information to the JX 13 sometime between August 10 and October 8, after Ronald had been accepted to the Veterans Cemetery and after Ronald had already signed JX 13.[565] She added this information to JX 13 consistent with Ronald's intent.[566] Further, while JX 57 was produced from a reliable source, it is not properly dated or witnessed.

Accordingly, JX 13 and JX 57 have not been authenticated under Delaware Rule of Evidence 901, and so they are not admissible.[567] However, I also find that JX 13 and JX 57 were completed by Donna, Kimberlyn, and Ronald, and signed by

---

[563] Kimberlyn Tr. 482–487, 572:2–14; *see* JX 13 at Plaintiffs 000189, Plaintiffs 0000192.

[564] Donna Tr. 719:21–721:22; Lawrence Tr. 872:2–8; Vincent Tr. 938:1–5, 942:5–9, 943:9–18, 954:7–10, 955:8–14; *see also* JX 23 (Statement of Wishes).

[565] Kimberlyn Tr. 572:2–12; JX 13.

[566] Kimberlyn Tr. 617.

[567] D.R.E. 901. Donna and Kimberlyn have failed to "produce evidence sufficient to support a finding that the item is what the proponent claims it is," even in the face of the low burden to do so. Inconsistent witness testimony, as well as the documents themselves, preclude the conclusion that these are legally valid and binding documents. *See Hardy v. Hardy*, 2014 WL 3736331, at *14 & n.114 (Del. Ch. July 29, 2014).

74

Vincent and Chris, with no intention of committing fraud or deception.[568] All believed that their actions effectuated Ronald's wishes.[569]

Edna contends that Ronald never wanted to be buried at the Veterans Cemetery.[570] She points to his difficulty with the VA and to his acceptance of being buried at Gracelawn while they were together. Ronald might have wanted to be buried at Gracelawn as far as Edna knows, but Edna does not have personal knowledge of Ronald's wishes after he left her on July 30. Even if he originally planned on being buried at Gracelawn, Ronald was capable of changing his mind, and Edna would have had no way knowing if he did.[571] I am unconvinced by Ronnie and Tiffine's testimony on this issue for the same reasons.

The preponderance of the evidence demonstrates that after leaving Edna, Ronald decided he wanted to be buried in the Veterans Cemetery and not in his marital plot at Gracelawn. As explained, Ronald's antipathy towards the VA was more nuanced than Edna contends and diminished over time, and even Edna

---

[568] *See* Kimberlyn Tr. 617 ("I didn't alter any documents. What we did was we added in where he wanted to be burial -- where he wanted to be buried, and just other pertinent information. So that is not altering any documents. My father was well aware of us putting that information in because that document was in our care. So we wanted to make sure we had it documented where he wanted to be."); *see also* Kimberlyn Tr. 495:2–6; Donna Tr. 716:17–719:12, 722:4–723:4, 918:6–16, 920:19–921:14. While Vincent and Chris did not properly witness the documents, they signed them nonetheless.

[569] Kimberlyn Tr. 495:2–6; Donna Tr. 716:17–719:12, 722:4–723:4, 918:6–16, 920:19–921:14.

[570] Edna Tr. 123:4–5.

[571] Edna Tr. 127:5–20.

understood Ronald wanted military honors at his funeral. Ronald's break from Edna was complete—geographically, emotionally, and financially—and his desire to be buried elsewhere is consistent with that break. While the Five Wishes Document (JX 13 and JX 57) suffers from authentication problems, the Veterans Cemetery application, the Statement of Wishes, and testimony from those who were with Ronald as he made his break from Edna support a finding that Ronald wanted to be buried in the Veterans Cemetery without interference from Edna.[572]

## I. Ronald's Last Days

Ronald began palliative care and decided to enter hospice care in September 2017.[573] Ronald's physical condition worsened until his death in October 2017.[574] During the first week of October 2017, Ronald took a turn for the worse. In addition to his failing physical health, Ronald's mental faculties began to deteriorate.[575] Ronald had the good fortune of being surrounded by most of his

---

[572] Ronald's medical records also support this conclusion: "The patient has . . . nam[ed] his daughters Donna and Kimberly as his surrogate decision makers. This is particularly important as the patient is separated, but not divorced, from his wife. He is adamant that his wife, Edna, is not to be involved in his medical care, his decision making, or his care after death." JX 58 at E.Williams0000445.

[573] *See* JX 58 at E.Williams000579; Donna Tr.798:4–6.

[574] Donna Tr. 800:7–24.

[575] Kimberlyn Tr. 408:23–409:1 (stating Ronald "was in his right state of mind all the way up until three days before he passed away"); Donna Tr. 629:17–19 (noting Ronald lost his ability to understand in the few days before her passed).

family, but Ronnie refused to see his father.[576] Rather, Ronnie stated, "[h]e made his bed. He can lay in it."[577]

On October 8, Ronald passed away.[578] When she learned the news, Edna called the police to report a "suspicious death"[579] and accused Donna and Kimberlyn of murdering Ronald.[580] The police did not investigate.[581] At trial, Edna and Ronnie still maintain the unsubstantiated belief that it is possible that Donna and Kimberlyn kidnapped and murdered Ronald, despite all of the evidence to the contrary, including Ronald's death certificate.[582]

Ronald was transported to Evans Funeral Home. However, Ronald was unable to be buried because of Edna's interference with the burial plans.[583] At that time, Donna and Kimberlyn filed for a temporary restraining order, submitting with it JX 13 and the Statement of Wishes. Chancellor Bouchard granted the

---

[576] *See* Patricia Tr. 742; *see also* Ronnie Tr. 1003.

[577] *E.g.*, Donna Tr. 629:14.

[578] Kimberlyn Tr. 584:15.

[579] Edna Tr. 225:7–226:2

[580] Kimberlyn Tr. 586:6–10 ("We, right before they were about to take my father's body out, New Castle County Police showed up. Apparently they were called because Edna accused me and my sister of murdering my father, or my father died of a suspicious death.").

[581] Edna Tr. 226:10–12.

[582] JX 32 (identifying cardiomyopathy as cause of death); Edna 225:7–227:14; Ronnie Tr. 1003; Patricia Tr. 742. Edna even entertained the possibility of bringing a wrongful death action against Donna and Kim. Edna Tr. 228:18–23.

[583] *See generally* D.I. 100.

order, giving Donna and Kimberlyn the authority to dispose of Ronald's remains and bury him at the Veterans Cemetery as he wished, subject to exhumation if they did not prevail on the merits.[584]

When the court issued its ruling, out of respect for their father's wife, Donna and Kimberlyn informed Edna that she could attend the funeral, even though doing so deviated from Ronald's wishes.[585] Edna attended, but Ronnie did not.[586] In accordance with this Court's order, Ronald was buried in the Veterans Cemetery.[587] And as Ronald wished, his service to in the United States Army was properly memorialized with two honor guards, the playing of taps, and the presentation of a flag to Donna and Kimberlyn.[588]

## II.  ANALYSIS

I now turn to the parties' affirmative claims and defenses. Donna and Kimberlyn assert only one claim, seeking a declaratory judgment that they had authority to dispose of Ronald's remains and that he shall remain in the Veterans

---

[584] D.I. 100 at 29:19–30:12.

[585] *See* Kimberlyn 496–97, 589. Edna caused a scene at the funeral, rendering the day very difficult for Ronald's family. Donna Tr. 803:16–23 ("A. She got up on the stand at the funeral, and read a letter. I can't give you specifics. I can tell you it was a total character assassination to the whole entire church. Q. What do you mean by that? A. It was a letter to my father, but it was just some of the stuff she said was directed towards me and my sister. It was just bad things."); *see also* JX 56 (Facebook posts).

[586] Ronnie Tr. 1003 ("Why would I go to a funeral that I had nothing to do with?").

[587] Kimberlyn Tr. 589; Donna Tr. 651–52.

[588] Donna Tr. 651–52.

78

Cemetery. In response, Edna raises the defense of unclean hands. And she affirmatively brings four claims that I address below: undue influence, tortious interference with inheritance, unjust enrichment, and declaratory judgment.[589] Edna's claims and defenses are premised on the unsupported contention that Donna and Kimberlyn used their position as Ronald's caretakers to subjugate his will and loot his assets in a scheme to spite Edna. But the preponderance of the evidence tells a different story, and nothing suggests that Donna and Kimberlyn capitalized on their father's misfortune for their own gain. As a result, Edna's claims and defenses concurrently unravel. Donna and Kimberlyn prevail on all claims, and the parties shall bear their respective costs and fees.

### A. Edna Has Failed To Demonstrate Ronald Was Unduly Influenced.

Edna claims that Ronald was unduly influenced by Donna and Kimberlyn and, as a result, executed several documents relating to his burial arrangements and removing Edna as the primary beneficiary on his Death Benefit and MetLife Policy.[590] Edna challenges the Five Wishes Document, MetLife Policy beneficiary designation dated September 13, 2017, and the Death Benefit beneficiary change

---

[589] Edna's Counterclaim Counts II, III, VII, and VIII do not assert causes of action; rather, they identify remedies. Edna also brought a counterclaim for tortious interference with economic interest, but she failed to address that claim in post-trial briefing. It is deemed waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1225 (Del. 1999).

[590] *See* D.I. 119 at 45–54.

79

dated August 2, 2017.[591]  Arguing that Ronald suffered from weakened intellect, Edna further contends that Donna and Kimberlyn bear the burden of demonstrating that he was not unduly influenced when executing these documents, and that they have failed to carry that burden.[592]  Accordingly, Edna asks for the foregoing documents to be rescinded or otherwise determined to be invalid.[593]  I conclude Ronald was not of weakened intellect and that Edna has failed to carry her burden that he was unduly influenced by his daughters when executing these documents. Because the Five Wishes Document is inadmissible, my undue influence analysis addresses only the MetLife Policy and Death Benefit.

"Undue influence occurs when a party exerts immoderate influence under the circumstances that overcomes the transferor's free will, resulting in a transfer that is not of her own choice and mind."[594]  For influence to be undue, it must rise to the level as to "subjugate [the actor's] mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a [document

---

[591] *See* D.I. 119 at 34.  Edna does not challenge the validity of the Statement of Wishes, contending that the PTO "identif[ed] only the August 3, 2017 and the September 13, 2017 documents as requiring validation."  *Id.* at 34 n.2.  I address this procedural argument below.

[592] *See* D.I. 119 at 53–54.

[593] *See* D.I. 119 at 60.

[594] *Mitchell v. Reynolds*, 2009 WL 132881, at *8 (Del. Ch. Jan. 6, 2009).

or transfer] that speaks the mind of another and not his own."[595]  The defense requires "an excessive or inordinate influence considering the circumstances of the particular case."[596]  "Unfair persuasion is the hallmark of undue influence."[597]

The elements of undue influence are: (1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect.[598]  Such a claim is "fact-intensive" and "often lacks direct evidence."[599]  The party claiming a document or transfer was the product of undue influence "must show that the [transferor's] mind was overcome by the influencer."[600]  But this burden shifts "under factual situations that lack implicit ethical safeguards."[601]

### 1. Edna Bears The Burden Of Proving Undue Influence.

---

[595] *Sloan II*, 2010 WL 2169496, at *7 (quoting *In re Estate of West,* 522 A.2d 1256, 1263 (Del. 1987)).

[596] *Mitchell*, 2009 WL 132881, at *8 (quoting *In re Will of McElhinney,* 2007 WL 2896013, at *3 (Del. Ch. Oct. 1, 2007)).

[597] *Id*.

[598] *Sloan II*, 2010 WL 2169496, at *7.

[599] *IMO the LW & T of Hurley*, 2014 WL 1088913, at *5 (Del. Ch. Mar. 20, 2014).

[600] *Will of Nicholson*, 1998 WL 118203, at *3 (Del. Ch. Mar. 9, 1998); *see Sloan v. Segal* (*Sloan I*), 2009 WL 1204494, at *13 (Del. Ch. Apr. 24, 2009) (noting challenging party bears the burden of proving undue influence absent special circumstances), *aff'd*, 2010 WL 2169496 (Del. 2010) (TABLE).

[601] *Sloan I*, 2009 WL 1204494 at *13 (internal quotation marks omitted) (quoting *In re Will of Melson,* 711 A.2d 783, 787 (Del. 1998)).

In *In re Last Will and Testament of Melson*,[602] our Supreme Court held that the burden of proof shifts to the proponent of the transfer document where the challenging party demonstrates by clear and convincing evidence that: 1) the document was executed by a testator who was "of weakened intellect"; 2) the document was drafted by a person in a confidential relationship with the testator; and 3) the drafter received a substantial benefit thereunder.[603] If this showing is made, the burden shifts to the proponent to prove the absence of undue influence by a preponderance of the evidence.[604] Edna has failed to demonstrate by clear and convincing evidence that the burden of proof should be shifted to Donna and Kimberlyn under *Melson*.

I first consider whether Donna and Kimberlyn were in a confidential relationship with Ronald. "Even outside a formally recognized fiduciary relationship, a relationship predicated on particular confidence or reliance may give rise to fiduciary obligations. Eschewing a formalistic approach, Delaware courts have declined to establish set bounds for such relationships, in favor of a pragmatic, fact-driven inquiry."[605] In *Sloan v. Segal*, our Supreme Court stated

---

[602] 711 A.2d 783 (Del. 1998).

[603] *Sloan I*, 2009 WL 1204494 at *13 (quoting *In re Will of Melson,* 711 A.2d at 788); *accord Sloan II*, 2010 WL 2169496, at *6; *In re Estate of Hammond*, 2012 WL 3877799, at *3 (Del. Ch. Aug. 30, 2012).

[604] *Sloan II*, 2010 WL 2169496, at *6.

[605] *Mitchell*, 2009 WL 132881, at *9.

"[a] confidential relationship exists where 'circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed.'" This court has often found that a confidential relationship existed where, as here, an adult child was taking care of an aging or infirm parent. In those cases, the court took into consideration whether the testators' relationships with their non-caretaker children were strained and whether the caretaking children were acting with power of attorney for their parents. These circumstances lend themselves to the creation of a confidential relationship because the parent must rely on a trusted child for physical, emotional, or decisional support.[606]

Clear and convincing evidence supports the conclusion that Donna and Kimberlyn were in a confidential relationship with Ronald.

When he entered their care on July 30, 2017, he was dependent on them for his physical support, shelter, access to medical care, and ability to handle his financial affairs. Ronald could not complete basic tasks without assistance. Reinforcing their existing fiduciary relationship, Ronald executed a power of attorney in favor of Donna and Kimberlyn in September 2017. As of July 30, Donna and Kimberlyn assumed a fiduciary obligation to Ronald, such that they were in a confidential relationship when Ronald executed changes to the MetLife

---

[606] *Sloan I*, 2009 WL 1204494, at *13 (footnotes omitted) (quoting *In re Will of Wiltbank,* 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005)); *see also Mitchell,* 2009 WL 132881, at *9 ("This Court has frequently looked to the transferor's extensive or exclusive reliance on another for physical, emotional, or decisional support, a query informed by the transferor's disposition and mental and physical capabilities, as well as the existence of any additional support network.")).

Policy and Death Benefit. Assuming, but not deciding, that Donna and Kimberlyn "drafted" the documents by helping Ronald complete them, Edna has satisfied the second *Melson* factor by clear and convincing evidence.

As for the third *Melson* factor, Donna and Kimberlyn received a substantial benefit from Ronald's changes to the MetLife Policy and Death Benefit.[607] As beneficiaries, they are to receive a total of roughly $107,000. Whether or not they planned to use those funds to pay Ronald's funeral expenses does not bear on this analysis. Before Ronald executed the beneficiary change forms, Donna and Kimberlyn were to receive nothing from the policies. Now, they stand to receive it all. That is a substantial benefit.[608]

I now turn to the first *Melson* factor and consider whether the MetLife Policy and Death Benefit changes were executed when Ronald suffered from weakened intellect.

---

[607] *See Sloan I*, 2009 WL 1204494, at *14.

[608] *Id.*

Although a precise standard for "weakened intellect" has not been articulated in our law, it has been recognized that the party challenging a [document] need not demonstrate an advanced degree of debilitation. Instead, "[t]he Court need only find that such 'weakened intellect' existed, taking into account factors such as a sudden change in the testator's living habits and emotional disposition." Importantly, the court need not find that someone lacked testamentary capacity to find that she was suffering from a weakened intellect.[609]

But this is a fact-intensive inquiry, and the Court considers all circumstances, including whether the individual was suffering from a debilitating mental condition and whether objective evidence indicates that the individual could comprehend, understand, and make decisions himself.[610]

Edna admits that none of Ronald's doctors indicated that he was incapable of making his own decisions before July 31, 2017. Ronald executed a power of attorney in Edna's favor on July 24, which Edna believes to be valid. Despite Ronald's single hallucination episode in May 2017 and despite his long-time depression and anxiety diagnoses, Edna believed Ronald was able to exercise his own judgment shortly before he left her on July 30.[611] I find the same. And the evidence demonstrates that Ronald left Edna of his own volition on that day.[612]

---

[609] *Sloan I*, 2009 WL 1204494, at *13 (alteration in original) (footnotes omitted) (quoting and citing *In re Will of Wiltbank,* 2005 WL 2810725, at *6).

[610] *See id.*; *In re Estate of Hammond*, 2012 WL 3877799, at *3.

[611] *See Sloan I*, 2009 WL 1204494, at *11, *15.

[612] *See, e.g.*, Kimberlyn Tr. 524:17–19 ("I don't want to be here with her no more. I am sick of her stuff. I want to go. I want out of here."); Donna Tr. 686:22 ("He was tired of

85

After leaving Edna, Ronald continued to suffer from depression and anxiety, and those conditions were likely exasperated by his "major change of living situation," which was a "major stressor."[613] When determining whether Ronald suffered from weakened intellect, I consider Ronald's change in living situation and emotional disposition in view of the other facts of this case.[614] Edna contends that Ronald's depression and anxiety, coupled with using medications that potentially could impair his mental faculties, rendered him of weakened intellect.[615] On this, I disagree.

Ronald's medical records indicate that Ronald's depression and anxiety did not render him incapable of making his own decisions and of overriding Donna and Kimberlyn's suggestions.[616] They show that his doctors believed Ronald's mental health was good considering his circumstances. Ronald was "alert,

---

[Edna's] sh*t. His words."). Edna maintains that on July 30, Ronald was incapable of making decisions for himself, and that he was coerced into leaving. *See, e.g.*, Edna Tr. 133:20–23. But the evidence demonstrates that Ronald chose to leave on his own volition. His 2017 decision to leave Edna is consistent with his 2012 decision to do the same, and Edna concedes that Ronald left of his own volition in 2012. *See id.* 112:11–13. I do not find Edna's testimony credible, and her position is contrary to the weight of the evidence.

[613] JX 58 at E.Williams000467.

[614] *See Sloan I*, 2009 WL 1204494, at *13.

[615] *See* D.I. 119 at 45–49.

[616] *See Sloan I*, 2009 WL 1204494, at *13.

oriented, cooperative, and appropriately conversant,"[617] he had "normal attention span and concentration,"[618] and his "mood and affect [we]re appropriate for the circumstance."[619]   Ronald could comprehend his treatment, understand communications with his doctors, and make decisions for himself.[620]  The records explicitly state that Ronald was "oriented" and was not "forgetful" or "disoriented."[621]  Ronald's medical records support a finding by the preponderance of the evidence that Ronald did not suffer from weakened intellect, despite his depression and anxiety and despite taking a number of medications that could have caused reduced mental capacity, but did not.[622]

And Ronald continued managing his own financial affairs with his daughters' assistance; he did not relinquish control.  He paid bills, received mail, and made phone calls.  When communicating with financial institutions, Ronald initiated the conversation, spoke with representatives, and permitted his daughters to speak with them.  Tellingly, although Ronald executed a power of attorney in

---

[617] *E.g.*, JX 58 at E.Williams000536, E.Williams000521; *see also* E.Williams000513 ("Mental status is alert."), E.Williams000489 (same), E.Williams000721 (same), E.Williams000656 ("Psychiatric:  Oriented and appropriate").

[618] *E.g.*, JX 58 at E.Williams000462.

[619] *E.g.*, JX 58 at E.Williams000529.

[620] *See, e.g.*, JX 58 at E.Williams000444–46, E.Williams000551, E.Williams000587; Donna Tr. 702.

[621] JX 58 at E.Williams000542.

[622] *See Sloan II*, 2010 WL 2169496, at *7.

their favor, Donna and Kimberlyn never used it. Donna and Kimberlyn dealt with these matters with Ronald, rather than simply on his behalf.[623]

The fact that Donna and Kimberlyn occasionally helped Ronald complete and understand documents does not render Ronald of weakened intellect. Ronald made his own decisions and understood the implications of the documents he executed. While his daughters sometimes explained those documents and other financial information to Ronald, he had the mental wherewithal to choose for himself and comprehend his actions. Ronald did not lose this ability until the first week of October 2017, when both his physical and mental health rapidly deteriorated.

Kimberlyn and Donna's dealings with their father from July 30, 2017 onward do not present a "factual situation[] that lack[s] implicit ethical safeguards."[624] While satisfying two *Melson* factors, Edna has failed to demonstrate by clear and convincing Evidence that Ronald suffered from "weakened intellect" on August 2 and September 13, when he executed the documents she challenges. The burden remains with Edna to prove by a preponderance of the evidence that Ronald was unduly influenced by his daughters when he named them as beneficiaries of the MetLife Policy and Death Benefit.

---

[623] *Compare Sloan I*, 2009 WL 1204494, at *13.

[624] *Sloan I*, 2009 WL 1204494, at *13 (quotation omitted).

## 2. Edna Has Failed To Carry Her Burden.

Edna must prove (1) Ronald was susceptible, (2) Donna and Kimberlyn had the opportunity to exert influence, (3) Donna and Kimberlyn had a disposition to do so for an improper purpose, (4) the actual exertion of such influence, and (5) a result demonstrating its effect.[625] Edna has failed to do so.

Enda has satisfied the first and second elements of the undue influence claim. Ronald was a susceptible individual.

> There is no precise definition or defining feature of susceptibility, but the analysis is informed by the subject's capacity and does not require an advanced degree of debilitation. Evidence of a subject's dependence on another, or a particular predisposition to accede to the demands of another person, may be sufficient to show susceptibility.[626]

The Court has previously determined an individual to be susceptible where he suffered "diminished capacity to take care of basic daily tasks" and "needed to rely on the help of family members and [the alleged influencer]."[627] While a finding of weakened intellect informs the inquiry, it is not necessary to render an individual susceptible.[628]

---

[625] *Sloan II*, 2010 WL 2169496, at *7.

[626] *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *10 (Del. Ch. July 22, 2016) (footnotes omitted); *see also Mitchell*, 2009 WL 132881, at *9.

[627] *In re Boyd*, 2003 WL 21003272, at *6 (Del. Ch. Apr. 24, 2003).

[628] *Matter of Estate of West*, 1985 WL 149632, at *4–5 (Del. Ch. June 20, 1985) (finding a testator did not lack testamentary capacity, but was susceptible due to her weakened

In this case, Ronald was dependent on Donna and Kimberlyn for his physical care after July 30, 2017. Ronald suffered from serious physical problems, and as a result, relied on Kimberly and Donna to assist him with basic tasks, as well as with managing his finances. And because of his immobility, Ronald was relatively confined to Donna's home, where Donna and Kimberlyn had near-constant access to him, being Ronald's primary caretakers apart from his physicians. They spent considerable time with Ronald from July 30, 2017 onward. Ronald's severely weakened condition and physical pain, coupled with his immobile, relatively confined circumstances, made him susceptible to undue influence.[629] The opportunity prong is satisfied by the fact that Donna and Kimberly helped Ronald complete the beneficiary changes at issue, as well as other changes to his affairs.[630] This is sufficient to establish that Ronald was susceptible

---

condition and the fact that she was living with another because she was unable to care for herself); *see Matter of Kittila*, 2015 WL 688868, at *15 (Del. Ch. Feb. 18, 2015) (MASTER'S REPORT) (concluding the testator did not have weakened intellect, and further concluding she was not susceptible because she was not socially isolated and was not dependent on others for her day-to-day life).

[629] *See Mitchell*, 2009 WL 132881, at *10; *Matter of Estate of Konopka*, 1988 WL 62915, at *3, *4 (Del. Ch. June 17, 1988) (noting that "undisputed evidence that [the individual] was suffering from severe physical problems," coupled with other factors, may be "amply sufficient to establish that [the individual] was susceptible to undue influence").

[630] *See Sloan II*, 2010 WL 2169496, at *7.

and that Donna and Kimberlyn had the requisite opportunity to exert undue influence.[631]

The third element of undue influence, motive to do so for an "improper purpose," may be satisfied where the alleged influencer "stood to benefit financially from such action"[632] under circumstances in which the alleged influencer's "continued ability to support himself was dependent on" the challenged transaction.[633] Edna attacked Donna and Kimberlyn's financial situation,[634] but while they carried debt, Donna and Kimberlyn's families were self-sufficient without the MetLife Policy and Death Benefit.[635]

Edna has also failed to demonstrate that Donna and Kimberlyn's finances motivated them to assist Ronald with changing the beneficiaries for the MetLife Policy and Death Benefit. In the first instance, those funds were always intended to pay for Ronald's funeral expenses, which remain outstanding. As for excess

---

[631] *See Mitchell*, 2009 WL 132881, at *10 (finding both elements satisfied where the testator was "was sick and required assistance in her daily living," where she "relied on [the alleged influencer], who spent considerable time with her," and where there was "some doubt as to [the testator's] ability to manage her finances consistently").

[632] *See Sloan II*, 2010 WL 2169496, at *7.

[633] *Sloan I*, 2009 WL 1204494, at *16.

[634] *See* D.I. 119 at 50.

[635] *See, e.g.*, Kimberlyn Tr. 455:1–456:8, 458:8–12, 472:23–473:1; Donna Tr. 721:16–19, 806:22–24.

funds, the evidence demonstrates that Donna and Kimberlyn were indifferent to that fact.  As Kimberlyn testified,

> I had nothing to benefit out of this. Do you actually think I wanted this?  My father was just told on September 12 when we took him to see his cardiologist, with the hope of now that he's in remission for his cancer, was released by Dr. Masters, now he can actually do something about his heart.  We never had any idea that day we walked in there . . . He came in and sat down and he said, there's nothing we can do for you.  You are going to die.  It threw me for a loop. You know what, out of all of that my dad still had the optimism when he walked out into that parking lot, because me and my sister had to hold ourselves together, couldn't breakdown and cry in front of him.  We had to hold ourselves together.  He said, I guess I got to get my affairs in order.  I never asked for this.  We was put in the middle of this. But at the end of the day I did everything my father asked me to do because that's my father.  I would do the same thing for my mother.  I didn't ask for his money.  I didn't need it.  I have my own money.  So I didn't do this to benefit out of anything. I did this for my dad because guess what?  He didn't have anybody else.  Him and his wife wasn't getting along.  My brother abandoned him.  My older sister didn't see him.  No one came to see my dad.  The only one he had there was me and my sister.  So I don't want there to be under any misconceptions we were trying to benefit of this.  I didn't want to do this.[636]

Kimberlyn and Donna were not motivated by personal gain.[637]  While they "stood to benefit financially"[638] from Ronald's decision to remove Edna from the MetLife

---

[636] Kimberlyn Tr. 455:1–456:8.

[637]  There is some hypocrisy in Edna's argument.  Edna was motivated in substantial part by personal gain to bring this lawsuit, which seeks the MetLife Policy, the Death Benefit, and to disinter her husband's body.  Edna remains able to be buried with Ronald in the Veterans' Cemetery.

Policy and Death Benefit, they did not require the policy funds for the "continued ability to support [themselves]."[639]

Edna also sees an improper motive in what she calls Donna and Kimberlyn's "long-standing and implacable hostility towards Edna."[640] While it may be true that Donna and Kimberlyn disliked Edna, the evidence demonstrates that they were motivated by their care for their father. When they assisted him with the beneficiary change forms, they did so with the knowledge that Ronald was dying and that he wanted to unburden them of his funeral costs. Nothing in the record demonstrates that they assisted Ronald with these forms to spite Edna. At trial, Donna testified,

> I didn't ask for this by any means necessary. The picture that is being painted of me is -- it is ridiculous. I never asked my father to leave his wife. I never asked for my father to come live with me. I did what I thought I needed to do. The Bible says, "Honor thy father and honor thy mother." That is what I did. I didn't -- am I an expert on medical documentation, by no means. But I thought what I thought I needed to do. What am I going to do tell this man, get out. Sorry, you can't live with me. Sorry you don't want to go back to your wife. That's not my problem. No, I wouldn't do that. I had to take this in stride and figure it out. That is all I did was try to figure it out one day at a time.[641]

---

[638] *Sloan II*, 2010 WL 2169496, at *7.

[639] *Sloan I*, 2009 WL 1204494, at *16.

[640] D.I. 119 at 50.

[641] Donna Tr. 699:11–22.

Donna and Kimberlyn never looked at their father's misfortune as an opportunity for their own gain over Edna, notwithstanding their checkered family history and the role that Edna played in it. And despite their distaste for Edna, Donna and Kimberlyn allowed her to attend Ronald's funeral, and have not complained about Edna receiving the rest of Ronald's estate. Their problems with Edna did not materialize into the improper purpose necessary to support Edna's claim.

Even if Edna had demonstrated the third element of improper motive, this Court is hesitant to "invalidate a document where doing so might frustrate the testator's intent."[642] Accordingly, our Supreme Court has made clear "that the existence of the opportunity to exert undue influence and a motive to do so is not enough to invalidate a will; rather there must also be actual exertion of improper influence and a result demonstrating its effect."[643] In this case, Donna and Kimberlyn became the beneficiaries of the MetLife Policy and Death Benefit, and that is sufficient to satisfy the fifth element: a result demonstrating the effect of undue influence.[644] Thus, the pivotal issue is whether the evidence establishes that

---

[642] *Sloan I*, 2009 WL 1204494, at *16.

[643] *Sloan II*, 2010 WL 2169496, at *7.

[644] *See In re Boyd*, 2003 WL 21003272, at *7 (Del. Ch. Apr. 24, 2003).

Donna and Kimberlyn actually exerted undue influence upon their father. It does not.

Actual exertion cannot be satisfied where the action is consistent with the individual's intent.[645] Ronald wanted nothing to do with Edna after he left her on July 30. He removed Edna as an authorized user on his financial accounts and redirected his income out of their joint bank account. He obtained a PFA against her to keep her away from him. He named Donna and Kimberlyn, not Edna, as his agents. As explained below, he changed his burial plans to separate himself from Edna forever. Ronald removed Edna as the beneficiary of his MetLife and Death Benefit to further implement his desire for a complete separation. As the Statement of Wishes demonstrates, Ronald tasked Donna and Kimberlyn with handling those arrangements, finances included; Ronald was adamant that Edna have no involvement. Ronald made Donna and Kimberlyn the beneficiaries so they could bear the financial burden of his burial. The documents Edna challenges are consistent with Ronald's intention, as proven by the evidence presented at trial, to excise Edna from his remaining days and burial plans.

As a result, the changes to the MetLife Policy and Death Benefit do not reflect actual exertion of undue influence. This is especially true "given the emotionally charged way their relationship ended," as well as the fact that Ronald

---

[645] *See Sloan II*, 2010 WL 2169496, at *7.

did not want any contact with Edna after he left her in July 2017.[646] Rather, the changes reflect Ronald's genuine desire to ensure that he was completely separated from Edna, and that Donna and Kimberlyn would receive the MetLife Policy and Death Benefit funds to ease their financial burden after his death.

The beneficiary changes to the MetLife Policy and Death Benefit are valid. Donna and Kimberlyn are entitled to a declaratory judgment to that effect.

## B. Edna's Tortious Interference And Unjust Enrichment Claims Also Fail.

Ronald wanted Donna and Kimberlyn to receive the benefit of the MetLife Policy and Death Benefit in order to lessen their financial burden from his death. Donna and Kimberlyn took actions related to those benefits at Ronald's request and to fulfill his wishes. More importantly, Ronald was adamant that Edna should not receive the MetLife Policy and Death Benefit funds, consistent with the fact that he forbade her involvement in his funeral. In view of these facts, Edna's claims for tortious interference with inheritance and unjust enrichment must fail.

Edna concedes that that this Court has been reluctant to recognize tortious interference with inheritance as a cause of action.[647] While other states recognize this cause of action, this case does not present grounds to bring that tort to

---

[646] *Sloan I*, 2009 WL 1204494, at *17.

[647] *See* D.I. 119 at 56.

96

Delaware. As this Court stated in *Mitchell v. Reynolds*, "[t]o the extent [Edna's] challenge is based on tortious interference with inheritance, Delaware's recognition of that cause of action is open to question and the facts of this case are outside the bounds of that tort as presented."[648] Donna and Kimberlyn did not unduly influence or defraud Ronald into removing Edna as the beneficiary of the MetLife Policy and Death Benefit. The choice was his and his alone. Donna and Kimberlyn only assisted Ronald in doing what he wanted to do.[649]

For the same reasons, Edna cannot demonstrate that Donna and Kimberlyn were unjustly enriched by Ronald's changes to the MetLife Policy and Death Benefit. To prevail on an unjust enrichment claim, Edna must demonstrate by a preponderance of the evidence (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[650] Our law recognizes that if a transfer is the result of undue influence, justification is absent and a remedy—often a constructive trust—is available.[651] But as discussed at

---

[648] *Mitchell*, 2009 WL 132881, at *13.

[649] *Id.* at *13 n.111 (noting the elements of Pennsylvania's tortious interference with inheritance claim include that the defendant used fraud, misrepresentation or undue influence to prevent execution of the intended bequest and noting that the Third Circuit recognizes "the tort is not recognized in all states, specifically citing Delaware").

[650] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[651] *See Jankouskas v. Adams*, 1981 WL 15142, at *3 (Del. Ch. May 18, 1981). Indeed, Edna seeks such a remedy in this case. *See* D.I. 119 at 58–59.

length, Ronald's actions were not the result of his daughters' undue influence and were consistent with his own intentions. Accordingly, Edna's claim fails.

## C. Ronald Shall Remain Buried At The Veterans Cemetery.

The parties seek competing declaratory judgments regarding Ronald's last funeral and burial rights.[652] Edna maintains that Ronald's remains were interred with a funeral home contrary to his wishes, subjected to a funeral not of his choosing that was arranged and conducted by individuals not of his choosing, and buried contrary to his wishes. But the preponderance of the evidence demonstrates that Ronald wanted to be buried in the Veterans Cemetery and that he wanted Kimberlyn and Donna to organize his burial and dispose of his remains. Kimberlyn and Donna are entitled to relief.

As a proud veteran, Ronald always intended to memorialize his military service at his funeral. While he initially intended to be buried with Edna at Gracelawn, his intentions changed as his relationship with Edna soured to the point of no return. Ronald wanted to separate himself from his estranged wife in life and death. Accordingly, Ronald told his daughters and others that he no longer wanted

---

[652] Edna seeks a declaration that she is authorized to oversee Ronald's last funeral and burial rights, including but not limited to the disinterment of his remains and reburial at Gracelawn. In their only affirmative claim, Kimberlyn and Donna seek a declaration that they had authority to dispose of Ronald's remains and that Ronald shall remain buried in the Veterans Cemetery. In addition, both parties seek a declaratory judgment regarding the MetLife Policy and Death Benefit beneficiary changes. Those concerns were addressed above in my undue influence assessment: the beneficiary changes are valid.

98

to be buried with Edna and that he wanted to be laid to rest in the Veterans Cemetery. Ronald stated that he "did not want that fat B laying on top of him"[653] and that "[h]e didn't want her to be involved or see anything."[654] Acting on this choice, Ronald completed an application to obtain what he was entitled to: a peaceful resting place among his fellow veterans in honor of his service to our country.[655]

Ronald also completed a Statement of Wishes in his own hand. The Statement of Wishes is clear. It mandates that Ronald's "[f]uneral arrangements [are] to be handled by my daughters Kimberlyn Ray and Donna Williams" and further mandates that Edna shall not be involved in Ronald's funeral arrangements under any circumstances.[656] The Statement of Wishes is an undisputedly valid and authenticated expression of Ronald's intent for Donna and Kimberlyn, not Edna, to handle his burial and funeral. As explained, Ronald created the Statement of Wishes with full capacity and without the exercise of undue influence. It contributes mightily to the preponderance of evidence proving Ronald wanted Donna and Kimberlyn to handle his funeral and burial.

---

[653] Patricia Tr. 738:5–6.

[654] Patricia Tr. 738:22–23.

[655] *See* JX 14.

[656] JX 23.

Donna and Kimberlyn arranged Ronald's funeral and his burial in the Veterans Cemetery. While the Statement of Wishes is silent as to where Ronald wanted to be buried, it gave Donna and Kimberlyn the authority to bury Ronald in the Veterans Cemetery as he intended. Donna and Kimberlyn honored their father's wishes and disposed of his remains as he desired.

Edna tries to dislodge this evidence, and particularly the Statement of Wishes, through unfounded procedural technicalities. She contends that Kimberlyn and Donna built their entire case on the Five Wishes Document, specifically JX 13; that they failed to raise the Statement of Wishes' sufficiency as a declaration under 12 *Del. C.* § 262 as an issue of law to be litigated;[657] that by these tactical choices, no evidence other than the Five Wishes Document, including the Statement of Wishes, can support their claim; and that the Five Wishes Document cannot serve as a Section 262 declaration because it is inauthentic,

---

[657] Section 262 is titled "Declaration of Disposition of Last Remains" and provides:

> The declarant may specify, in a declaration instrument, any 1 or more of the following:
>
> (1) The disposition to be made of the declarant's last remains;
>
> (2) Who may direct the disposition of the declarant's last remains;
>
> (3) The ceremonial arrangements to be performed after the declarant's death;
>
> (4) Who may direct the ceremonial arrangement after the declarant's death; or
>
> (5) The rights, limitations, immunities, and other terms of third parties dealing with the declaration instrument.

leaving Kimberlyn and Donna without any evidence that Ronald wanted to be buried in the Veterans Cemetery.[658]

As explained above, both iterations of the Five Wishes Document, presented at JX 13 and JX 57, are inadmissible. I do not consider the Five Wishes Documents when determining Ronald's final wishes and intentions. Accordingly, I need not determine whether JX 13 or JX 57 meet Section 262's requirements for a declaration instrument.

Contrary to Edna's contention, Donna and Kimberlyn rely on much more than JX 13 to prove Ronald's intent. In particular, Donna and Kimberlyn have relied on the Statement of Wishes since this action's inception. They submitted both JX 13 and the Statement of Wishes to this Court when they filed their Petition and moved for the October 2017 TRO.[659] The Petition primarily relies on the Statement of Wishes.[660] Chancellor Bouchard considered both JX 13 and the Statement of Wishes when granting the October 2017 TRO,[661] and he was especially persuaded by the Statement of Wishes.[662]

---

[658] *See* D.I. 119 at 54–55; D.I. 125 at 14–15 (citing PTO at 6).

[659] *See* Pet. ¶¶ 7, 11, 18; D.I. 100 at 6:13–20.

[660] *Compare* Pet. ¶¶ 11, 18, *with id.* ¶ 7.

[661] *See* D.I. 100 at 6:13–20, 20:22–19, 33:22–34:16.

[662] *See* D.I. 100 at 33:22–34:16 ("The second document is dated September 18th, 2017. That document is called a statement of wishes. In this document, Mr. Williams personally wrote in longhand that his funeral arrangements were to be handled by his

Edna seeks shelter in the fact that Donna and Kimberlyn did not include the Statement of Wishes' status as a Section 262 declaration as an issue of law to be litigated in the Pre-Trial Order.[663] Unlike the Five Wishes Document, the Statement of Wishes' authenticity is not disputed. And Edna has advanced no meaningful argument that the Statement of Wishes is *not* a declaration instrument under Section 262.[664]

The Statement of Wishes was produced in discovery, and Edna had the opportunity to ask questions about it at deposition.[665] It appeared on the Amended Joint Exhibit List without objection, was offered by Donna and Kimberlyn at trial, and was admitted into evidence.[666] Edna had the opportunity to ask questions of those who testified about it.[667] There was no motion in limine and no objection at

daughters, Kimberlyn Ray and Donna Williams. That's the document, Mr. Powell, I handed to you earlier. Mr. Williams also wrote that he did not want his wife to be involved in his funeral arrangements. By the way, I have taken a look at that document. I have dealt with a few competency cases in my life, and from the face of it, it did not look like an incompetent person completed that document. The expression of the wishes was very clear. I'm not saying there couldn't be authentication issues, or something like that, associated with that document, but there wasn't an obvious indication that this was completed by somebody who didn't know what he wanted.").

[663] *See* D.I. 125 at 15.

[664] *See generally* D.I. 119, 125.

[665] *See* D.I. 132 at 28:4–11.

[666] *See* D.I. 105; JX 23.

[667] *See* D.I. 132 at 28:4–11.

trial regarding the Statement of Wishes.[668] And when pressed on Edna's position at post-trial argument, her counsel could not identify case law supporting the proposition that if evidence does not go directly to a specifically stated issue of law to be litigated in the pretrial order, then the Court cannot rely on that evidence for broader issues, even if the evidence was presented and elicited testimony at trial.[669] I do not adopt Edna's unsupported position.

As explained, the Statement of Wishes provides powerful and unrebutted evidence that Ronald wanted Donna and Kimberlyn, and not Edna, to handle his burial and funeral. Even without the trappings of Section 262, the Statement of Wishes presents powerful evidence of Ronald's intent. The fact that its status under Section 262—which appears to be undisputed—was not raised in the Pre-Trial Order does not diminish its evidentiary effect.

To resolve any doubt, I further find that the Statement of Wishes constitutes a declaration instrument under 12 *Del. C.* § 262. That provision allows one to execute a declaration instrument that directs the disposition of one's last remains and identifies who may direct disposition of the remains and handle ceremonial arrangements. The Delaware Code defines "declaration instrument" as "a written instrument, signed by a declarant, governing the disposition of the declarant's last

---

[668] *See* D.I. 132 at 29:13–18.

[669] *See* D.I. 132 at 30:1–12.

103

remains and the ceremonies planned after a declarant's death."[670] Ronald wrote the Statement of Wishes by hand and signed it. Under the plain language of Section 262, the Statement of Wishes is a valid declaration instrument directing Donna and Kimberlyn, to the exclusion of Edna, to direct the disposition of Ronald's remains and his ceremonial arrangements.

Donna and Kimberlyn are entitled to a declaratory judgment that Ronald's remains were disposed of consistent with his wishes and shall remain in the Veterans Cemetery. Edna is not entitled to a declaratory judgment in contravention of the Statement of Wishes' express terms. Ronald's body shall not be disinterred, and he shall remain buried in the Veterans Cemetery.

### D. The Unclean Hands Doctrine Does Not Bar Donna And Kimberlyn's Request For A Declaratory Judgement.

Donna and Kimberlyn seek a declaration that Ronald's body should not be disinterred and that his changes to the Death Benefit and MetLife Policy beneficiary designations are valid. Edna contends that their affirmative claim for relief is barred by the equitable doctrine of unclean hands.[671] I disagree and hold that the doctrine of unclean hands does not foreclose a declaratory judgment in Donna and Kimberlyn's favor.

---

[670] 12 *Del. C.* § 260.

[671] *See* D.I. 119 at 34–44.

"The affirmative defense of unclean hands embodies the basic and long upheld principle followed by the Court of Chancery that 'he who comes into equity must come with clean hands.'"[672] "The doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case."[673] The Court has "extraordinarily broad discretion in application of the doctrine [of unclean hands]."[674] But "the improper conduct must relate directly to the underlying litigation."[675] And the "inequitable conduct must have an immediate and necessary relation to the claims under which relief is sought,'"[676] and the litigant must engage in "reprehensible conduct in relation to the matter in controversy."[677] Where the alleged inequitable conduct is "far beyond the scope of the Complaint in this action" or is "irrelevant to the question of" law before the

---

[672] *In re Barker Tr. Agreement*, 2007 WL 1800645, at *11 (Del. Ch. June 13, 2007) (quoting *Bodley v. Jones,* 59 A.2d 463, 469 (Del. Ch. 1947)).

[673] *Sloan II*, 2010 WL 2169496, at *6.

[674] *Id.* (alteration in original) (quoting *Nakahara v. NS 1991 American Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998)); *see also Matter of Lomax*, 2019 WL 4955315, at *2–3 (Del. Ch. Oct. 8, 2019).

[675] *Sloan II*, 2010 WL 2169496, at *6 (internal quotation marks omitted) (quoting *Nakahara*, 718 A.2d at 522).

[676] *Id.* (quoting *Nakahara*, 718 A.2d at 522).

[677] *Matter of Lomax*, 2019 WL 4955315, at *2–3 (quoting *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014)); *accord In re Barker Tr. Agreement*, 2007 WL 1800645, at *11.

Court, unclean hands will not apply.[678]  The party asserting the unclean hands bears the burden of pleading and proving the affirmative defense.[679]

For the Court to apply the unclean hands doctrine in this case, Edna must prove that Donna and Kimberlyn's purported inequitable conduct relates directly to this litigation and has an "immediate and necessary" relationship to the claims under which relief is sought.[680]  Edna contends that Donna and Kimberlyn are barred by unclean hands for three reasons:  1) "their exercise of undue influence," 2) "their breaches of fiduciary duties," and 3) "their actions, fraudulent at worst, unconscionable at best," relating to the Five Wishes Document, presented in the October 2017 TRO as JX 13.[681]  These grounds are insufficient to justify invoking unclean hands to bar Donna and Kimberlyn's claim.  I address each in turn.

First, the Court's determination that a party exerted undue influence may be sufficient to support application of the unclean hands doctrine.[682]  But as discussed above, Edna has failed to prove that Donna and Kimberlyn unduly influenced Ronald.  Undue influence cannot be the basis of Edna's unclean hands defense.

---

[678] *Sloan II*, 2010 WL 2169496, at *6.

[679] *See Matter of Lomax*, 2019 WL 4955315, at *2–3.

[680] *Sloan II*, 2010 WL 2169496, at *6.

[681] D.I. 119 at 35.

[682] *In re Will of Stotlar*, 1987 WL 31646, at *1 (Del. Ch. Dec. 29, 1987), *aff'd sub nom. Stotlar v. Cook*, 542 A.2d 358 (Del. 1988).

Second, Edna cannot use Donna and Kimberlyn's purported breach of fiduciary duty as the basis for her defense. Absent some special circumstance, this Court has recognized that unclean hands may foreclose the claimant's relief where she has breached her fiduciary duties.[683] As discussed with respect to Edna's undue influence claim, Donna and Kimberlyn were in a confidential relationship with Ronald that gave rise to fiduciary obligations: "a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another."[684] But they have not engaged in the type of self-dealing that would trigger unclean hands. They did not initiate the MetLife Policy and Death Benefit changes; rather, Ronald decided to make those changes and requested his daughters' assistance in completing the task. Further, Donna and Kimberlyn acted in Ronald's best interest when assisting with the beneficiary changes and other paperwork, including the Five Wishes Document. No evidence supports a finding to the contrary.

Finally, I reject Edna's contention that Donna and Kimberlyn have unclean hands because they allegedly misled this Court by submitting the Five Wishes Document as JX 13, but not JX 57, with their Petition and motion for the October

---

[683] *Craig v. Graphic Arts Studio, Inc.*, 166 A.2d 444, 447 (Del. Ch. 1960).

[684] *Mitchell,* 2009 WL 132881 at *9 (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 113 (Del. 2006)).

2017 TRO.[685]  In support, Edna makes the unsubstantiated claim that Ronald had

no part in completing JX 13; argues that the document was improperly witnessed;

and contends that Donna and Kimberlyn purposefully concealed JX 57 from the

Court in October 2017 and throughout discovery.  I am unconvinced that these

grounds justify exercising my discretion to apply the unclean hands doctrine.

Donna and Kimberlyn's allegedly inequitable conduct with respect to the

Five Wishes Document "must have an immediate and *necessary* relation to the

claims under which relief is sought."[686]  JX 13 and JX 57 are inadmissible and are,

therefore, unnecessary to deciding the claims presented in this action.  Likewise,

JX 13 was not the sole document that Chancellor Bouchard considered when

issuing the October 2017 TRO.  To the contrary, he was greatly persuaded by the

Statement of Wishes, drafted by Ronald's own hand, which is consistent with

Ronald's intentions as supported by the preponderance of the evidence presented at

trial.  Through that document, Ronald gave Donna and Kimberly the authority to

dispose of his remains.  And although it does not specifically provide that Ronald

wanted to be buried at the Veterans Cemetery, Donna and Kimberlyn buried him

---

[685] *See* D.I. 119 at 35–37.  Edna also contends that Donna and Kimberlyn engaged in inequitable conduct with respect to the MetLife Policy beneficiary change form, primarily contending that Ronald was entirely removed from the process and that his daughters commandeered his will.  *See id.* at 37–39.  For the reasons already discussed at length in this Opinion, Edna's argument is unpersuasive:  Ronald removed her as the beneficiary of the MetLife Policy and was not influenced by his daughters in doing so.

[686] *Sloan II*, 2010 WL 2169496, at *6 (emphasis added) (quotation omitted).

there in accordance with his wishes. At bottom, the Five Wishes Document did

not affect the validity of Ronald's choices after July 30, 2017. The Five Wishes

Document, presented at JX 13 and JX 57, was not necessary to Donna and

Kimberlyn's affirmative claim and therefore cannot support Edna's unclean hands

defense.[687]

Donna and Kimberlyn deny that they misled the Court when submitting JX

13 but not JX 57 in pursuit of the October 2017 TRO.[688] There is no evidence that

they actively concealed JX 57 from the Court, or intended to do so. I have found

that Donna and Kimberlyn harnessed no nefarious intent when submitting JX 13 in

this matter.[689]

---

[687] *See Matter of Lomax*, 2019 WL 4955315, at *3 ("I find no direct relation, however, between David's misconduct and the matter in controversy here. David's misconduct does not affect the validity of the 2013 Will, the Decedent's capacity to execute that Will, or whether it was a product of Robert's undue influence. Robert, not David, took the Decedent to have the 2013 Will prepared. I disagree with Robert's argument that this litigation is directly related to David's misconduct because it involves the Decedent's assets – whether while he was living or after his death. Such claims are beyond the scope of this action and I decline to apply the doctrine of unclean hands, as a matter of law, or to recommend that the Court grant summary judgment on this issue.").

[688] Donna and Kimberlyn contend that Ronald signed both JX 13 and JX 57 on August 3; that Ronald kept JX 13 in his possession and distributed JX 57 to his doctors; and that accordingly, the language about his burial was added only to JX 13 after his application to be buried at the Veterans Cemetery was accepted. JX 57 was produced by Dr. Masters along with Ronald's medical records. Donna and Kimberlyn contend that JX 57 was not in their possession at the time of the October 2017 TRO. *See* D.I. 123 at 31–32. As explained, both JX 13 and JX 57 suffer from inauthenticity problems, and so I do not make any findings of fact as to their origins.

[689] *See, e.g.*, Kimberlyn Tr. 617:2–9. At post-trial argument, Edna's counsel conceded that the sophistication of the parties was relevant to submitting JX 13 when seeking the

Even assuming Donna and Kimberlyn intentionally withheld JX 57 while submitting JX 13 in October 2017, the circumstances of this case do not require me to invoke unclean hands. In *Sloan v. Segal*, this Court has declined to invoke unclean hands, even where a litigant misled this Court and another during estate proceedings, where the testator was not forced to act against her will and where applying unclean hands would thwart the testator's intent.[690] Rather, then-Vice Chancellor Strine took the deceit into account in assessing the litigant's credibility.[691] Here, Donna and Kimberlyn's explanations about the Five Wishes Document's execution, witnessing, date, possession, and when additional contents were added to JX 13 were inconsistent with the documents themselves and were impeached by Kimberlyn's deposition. At bottom, Donna and Kimberlyn lacked credibility with respect to the Five Wishes Document. I have accordingly discounted their testimony about that document in my factual findings, resulting in a determination that both JX 13 and JX 57 are inadmissible.[692]

JX 57 was ultimately produced in discovery by Dr. Masters, and Edna had ample opportunity to use JX 57 in this litigation. Indeed, she effectively teased out

---

October 2017 TRO. *See* D.I. 132 at 64:7–10 ("They were unsophisticated. They did the best they could. That may explain October 10, 2017. That's the date the petition was filed.").

[690] *See Sloan I*, 2009 WL 1204494, at *17–18.

[691] *Id.*

[692] *Id*. at *18.

the problems with JX 57 together with JX 13, leading to JX 13's exclusion as inadmissible. Where no harm resulted from JX 13 or JX 57, and absent clear evidence that Donna and Kimberlyn misled the Court in October 2017, I decline to exercise my discretion to apply unclean hands. Consequently, I do not agree that Donna and Kimberlyn's conduct is "so repugnant that the court must automatically deny" them a declaratory judgment in their favor.[693]

At bottom, "[t]his court has broad leeway in exercising its equitable judgment under this maxim, and is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[694] In my view, applying the doctrine of unclean hands by his daughters to frustrate Ronald's intentions would be supremely inequitable.[695] Throughout this narrative, Ronald's daughters fiercely adhered to his wishes. They have come to this Court with the intent of allowing their father to rest in peace. The doors of this Court will not be shut against them in their efforts to effectuate Ronald's wishes; any other result would be inequitable.

---

[693] *Id.*

[694] *In re Barker Tr. Agreement*, 2007 WL 1800645, at *11 (internal quotation marks omitted) (quoting *Nakahara*, 718 A.2d at 522).

[695] *See Sloan I*, 2009 WL 1204494, at *18.

## E.    The Parties Shall Bear Their Own Costs And Fees.

Both parties contend they are entitled to costs and fees in bringing this action.  Delaware courts generally follow the American Rule, which holds litigants responsible for their own costs and fees.[696]  "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[697]  The Court recognizes an exception to this rule where a party has acted in bad faith.[698]  "Delaware courts have previously awarded attorneys' fees where (for example) parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[699]  "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[700]  A lesser breach of fiduciary duty alone will not merit departing from the American Rule.[701]

Here, neither party's conduct rises to the level of bad faith requisite to justify fee-shifting.  Donna and Kimberlyn brought their claims in good faith, and there is

---

[696] *See, e.g.*, *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[697] *Id.*

[698] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012); *see also Estate of Carpenter v. Dinneen*, 2008 WL 859309, at *17 (Del. Ch. Mar. 6, 2008).

[699] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG,* 720 A.2d 542, 546 (Del. 1998)).

[700] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010).

[701] *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124–25 (Del. Ch. 1999).

no evidence that they unduly influenced Ronald, engaged in fraud, or breached their fiduciary duties.  And although Edna has not prevailed in this action, Donna and Kimberlyn have not offered evidence that Edna "unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[702] The parties must bear their respective costs and fees in accordance with the American rule.

## III.  CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiffs on all counts.  Ronald shall remain buried peacefully in the Veterans Cemetery, his final resting place, and the MetLife Policy proceeds shall be distributed to Plaintiffs. The parties shall submit a stipulated implementing order within twenty days.

---

[702] *Montgomery Cellular*, 880 A.2d at 227 (internal quotation marks omitted) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG,* 720 A.2d 542, 546 (Del. 1998)).  Under the circumstances of this case, my conclusion holds true even despite my finding that Edna forged Ronald's signature on JX 53.